**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SELWYN DAYS,** | **FIRST AMENDED COMPLAINT** |
| **Plaintiff,** | **Dkt. No. 18 cv 11538 (NSR-LMS)** |
| -against- | |
| **THE EASTCHESTER POLICE DEPARTMENT, THE TOWN OF EASTCHESTER, THE COUNTY OF WESTCHESTER, MARIO ASTARITA, GEORGE BARLETTA, MATTHEW KIERNAN, AND CHRISTOPHER CALABRESE,** | |
| **Defendants.** | |

**PLEASE TAKE NOTICE** that Plaintiff Selwyn Days, through his attorneys, Glenn A.

Garber, P.C., Rickner, PLLC, and Lord & Schewel PLLC hereby alleges as follows:

### NATURE OF THE CASE

1.      Although innocent, Plaintiff Selwyn Days ("Days") was wrongfully convicted of

the 1996 Eastchester homicides of Archie Harris and Betty Ramcharan ("Eastchester murders")

and served nearly seventeen years in jail until he was finally exonerated and released in 2017.

2.      In the wake of the wrongful conviction, Days is struggling to pick up the pieces of

his broken life.

3.      The debacle of justice that caused Days' wrongful conviction and ensuing

nightmare began for him on February 15, 2001, when he was arrested in Mount Vernon, New

York, regarding a relatively minor offense – a violation of an order of protection involving an

ex-girlfriend.

1

4.     While detained, the police received an anonymous tip that Days may have been responsible for the 1996 Eastchester murders, which was an unsolved case.  The police tracked down the source of the call, who it turned out was Days' ex-girlfriend and the same person that made the complaint on the order of protection.  She was incentivized to falsely implicate Days, and was an unreliable source which was apparent to the police.  Nevertheless, the police pressured and manipulated her to provide a false account that Days told her that he committed the Eastchester murders.

5.     The police then interrogated Days for nearly seven hours over a sixteen-hour period of custody.  During this time, they used coercive and manipulative tactics to cause him to falsely confess.

6.     The police also took advantage of Days' mental illness and cognitive deficits to secure the false confession.

7.     Instead of videotaping the entire interrogation, the police decided to only videotape the last two hours, after they rehearsed with Days a false narrative they concocted and after preparing him to make the false confession on camera.

8.     The police then presented the unreliable information from Days' ex-girlfriend and his false confession to the Westchester County District Attorney to create the illusion of probable cause, thus causing an unsubstantiated indictment and prosecution.  The police also lied to the prosecutors about the nature of their work surrounding the questioning of Days' ex-girlfriend and the interrogation of Days, and they failed to reveal the misconduct they engaged in to obtain this evidence.

9.     Moreover, despite the obvious need to train, supervise, and monitor officers in regard to properly obtain confessions and avoiding the elicitation of false confessions, the

Eastchester Police Department, the Town of Eastchester, the County of Westchester and the Westchester County Police Department failed to do so in utter disregard of conducting fair and truthful investigations.  The Eastchester Police Department also fostered a culture of hostility and racism toward suspects and criminal defendants, and African Americans in particular, that contributed to Days' wrongful prosecution and conviction; and they failed to discipline officers when their misguided animus and/or misconduct was known or should have been known.

10.    But for the unreliable information from Days' ex-girlfriend and his false confession, not a scintilla of evidence linked Days to the crime.  Leveraging the importance of this dubious evidence and acting in bad faith, the police also lost or destroyed physical evidence of forensic value that could have exculpated Days, despite having an obligation to preserve it.

11.    As a result of the police misconduct and coverup, the failure to train, supervise, monitor or discipline officers, and/or the failure to prevent or correct a culture of hostility and racism, and the destruction of evidence, Days was wrongfully prosecuted, convicted, and sentenced, and served almost seventeen years in jail notwithstanding his innocence.

12.    This cause of action raises violations of Days' civil rights under 42 U.S.C. § 1983 and under state law, and involves the deprivation of Days' rights against self-incrimination, due process of law, a fair trial, the right to be free from malicious prosecution, the right to be free from a conspiracy o violate his rights, and his due process right to have relevant exculpatory evidence collected and preserved; it also holds the individual defendants responsible for their wrongdoing, as well as the Town of Eastchester and the Eastchester Police Department under *Monell v. Department of Social Services of the City New York,* 436 U.S. 658 (1978), and the doctrine of *respondeat superior;* and it seeks monetary damages for the harm caused to Days from the wrongdoing.

**JURISDICTION AND VENUE**

13.     This Court has original subject matter jurisdiction over Days' federal law claims

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Days' claims arise under a law of

the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of

state law, of rights guaranteed by the United States Constitution.

14.     This Court has supplemental jurisdiction over Days' state law claims pursuant to

28 U.S.C. § 1367(a).

15.     Days complied with the requirements of New York General Municipal Law

Section 50-i by serving a notice of claim on the Town of Eastchester and the County of

Westchester on November 2, 2017.  More than 30 days have elapsed since the notice of claim,

and no offer of settlement has been made.

16.     Days submitted to a hearing pursuant to New York General Municipal Law

Section 50-h on May 21, 2018.

17.     Venue is lodged in the United States District Court for the Southern District of

New York pursuant to 28 U.S.C. § 1391(b) because substantial parts of the events or omissions

giving rise to the claim occurred in the Southern District of New York, including, but not limited

to, Days' interrogation, false confession, wrongful prosecution, and wrongful conviction.

18.     At all relevant times in this Complaint (hereinafter "all relevant times") and

currently some of the defendants reside, work, and/or have their principal places of business

within the jurisdiction of the United States District Court for the Southern District of New York.

**JURY DEMAND**

19.     Days demands trial by jury in this action.

4

**PARTIES**

20.    Days was wrongfully indicted, prosecuted, tried, convicted, and imprisoned by the actions of the Defendants named herein.

21.    Defendant Town of Eastchester is a municipal corporation existing by virtue of the laws of the State of New York and a political subdivision of the State of New York.

22.    The Eastchester Police Department is an agency of the Town of Eastchester.

23.    Defendant County of Westchester is a municipal corporation existing by virtue of the laws of the State of New York and a political subdivision of the State of New York, and the Westchester County Police Department also known as the Westchester Police Department and the Westchester County Department of Public Safety is an agency of the County of Westchester.

24.    Defendant Mario Astarita ("Astarita") was at all relevant times a detective employed by the Eastchester Police Department. He is named in his individual capacity.

25.    Defendant George Barletta ("Barletta") was at all relevant times a detective employed by the Eastchester Police Department. He is named in his individual capacity.

26.    Defendant Matthew Kiernan ("Kiernan") was at all relevant times a detective employed by the Eastchester Police Department. He is named in his individual capacity.

27.    Defendant Christopher Calabrese ("Calabrese") was at all relevant times a detective employed by Westchester County. He is named in his individual capacity.

28.    Defendants Astarita, Barletta, Kiernan and Calabrese are at times collectively referred to as the "Individual Defendants" herein.

29.    At all relevant times the Individual Defendants were acting under color of state law.

30.    At all relevant times the Individual Defendants acted individually and in concert and conspiracy, deliberately and recklessly.

31.    "Defendants" refers herein to the Individual Defendants, the Town of Eastchester, the Eastchester Police Department, and the County of Westchester.

32.    Defendants caused the wrongful indictment, prosecution, conviction and incarceration of Days.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### Procedural History

33.    Days was indicted on April 25, 2001 and charged with two counts of murder in the second degree under the New York State Penal Law.  He was tried in 2003 and that trial ended in a hung jury.

34.    Days was re-tried in 2004, when he was convicted by a jury of two counts of murder in the second degree; and was sentenced to two consecutive terms of 25-years-to-life for a total of 50-years-to-life in New York state prison.

35.    In 2006, the Appellate Division, Second Department, affirmed the convictions. People v. Days, 31 A.D.3d 574 (2d Dept. 2006).

36.    While serving his sentence, in 2007, Days moved to vacate his convictions pursuant to C.P.L. § 440.10.

37.    In December 2009, Days' convictions were vacated and a new trial was ordered. *People v. Days,* 2009WL5191433 (Westchester Co., Dec. 31, 2009) (Cohen, J.).  The decision to vacate rested on ineffective assistance of counsel and the failure of trial counsel to investigate and advance an alibi that Days was actually in Goldsboro, North Carolina, when the murders occurred in Eastchester, New York.

38.    Days was retried twice in 2011 – the first ended in a mistrial and the second ended with a conviction.  Days was again sentenced to 50-years-to-life in prison.

39.    The December 2011 conviction was then reversed, and a new trial was ordered. *People v. Days*, 131 A.D.3d 972 (2d Dept. 2015). The reversal primarily rested on the violation of Days' right to a fair trial due to the trial court's failure to permit testimony from a false confession expert.

40.    The case was retried in August and September of 2017. On September 12, 2017, Days was acquitted of all charges, the indictment was dismissed, and he was released from jail.

41.    Prior to being released, Days served sixteen years and seven months in jail – 10 years and five months of that time was spent in New York State custody.

### The Crime Scene Evidence has no Connection to Days and Points to other Perpetrators

42.    On November 21, 1996, at 11:45 am, Harris and Ramcharan were found murdered in Harris' home in Eastchester, New York.

43.    Following the discovery of the victims, the Eastchester Police Department, the Westchester Police Department, and the Westchester Department of Laboratories and Research ("WDLR") arrived at the crime scene and collected a plethora of evidence.

44.    It was a particularly gruesome crime likely to produce evidence traceable to the culprit(s). Harris was bludgeoned to death with a baseball bat and his bloody body was dragged through the house. Ramcharan was choked and her throat cut, and her blood saturated the bathroom floor.

45.    Moreover, it was the prosecution's theory that the murders were not pre-meditated by Days but committed by him in the heat of passion when he went to Harris' house to confront him about the molestation by Harris of his mother Stella Days who was one of Harris' home healthcare aides. Thus, under the prosecution's narrative Days would not have worn gloves or taken precautions to conceal evidence linking him to the crime scene.

46.    However, none of the substantial forensic evidence recovered from the house matches Days.  Indeed, the most significant forensic evidence excludes Days and points to others.

47.    Biological material for DNA testing was found on, among other things, the murder weapon, a knife found on the bathroom floor next to Ramcharan's head; on cigarette butts that were located near a chair in the basement where Ramcharan was apparently tied up before she was killed; and on rope found around the same chair.  However, DNA testing of this evidence excluded Days as a donor, and revealed biological material from other males.[1]

48.    Fingerprints recovered from the outside door of the house and the bathroom door jamb above the spot where Ramcharan's body was found did not match Days' fingerprints.

49.    Trace evidence, including fiber samples, did not link Days to the crime.

50.    And, a male Caucasian hair found on Harris' sock was not Days'.

**Days was in Goldsboro, North Carolina,
when the Murders Occurred in November 1996**

51.    No photograph, video, cell site, GPS tracking device, or witness places Days in or near New York at the time of the murders. By contrast, evidence adduced during a post-

---

[1] Clearly indicating his innocence, Days provided his DNA for comparison to DNA found at the crime scene.  Moreover, he requested that the WDLR – the entity that did the original forensic workup in the case for the prosecution – perform all DNA testing it was capable of doing to find the true killer.  Days' lawyers also hired an outside forensic biology laboratory to utilize the most advanced techniques beyond those available to the WDLR to assist the effort.

Because DNA from the other males consisted of partial profiles, they could not be matched to know profiles of others in law enforcement DNA databases.  Notably, at the insistence of the defense the WDLR did a "keyboard override" and determined that 64 people in the New York State Department of Criminal Justice Services' DNA database shared the same DNA markers or loci contained in the partial profiles recovered from the crime scene evidence.  However, due to privacy laws surrounding the DNA database, the names of these individuals were not revealed to the defense for further investigation.

conviction reinvestigation, and during litigation after the second trial, establishes overwhelmingly that Days was living in Goldsboro, North Carolina, with his mother, Stella Days, when the murders occurred.

52.    Days' alibi is detailed and supported by documentary evidence, and it covers the period when the murders could have occurred, November 19th to 21st, 1996.

53.    The alibi witnesses include Remona McIver, a former Magistrate Judge in North Carolina; Captain Perry Sharp, a retired homicide detective with the Goldsboro Police Department; Donald Evans, a local restauranteur in Goldsboro; Melody Webb, a teller at a post office in Goldsboro; and Cindy Artis, Days' girlfriend at the time.  Their accounts are specific and have been consistent for years.

54.    Magistrate McIver recalled seeing Days in her office on November 21, 1996, when Days and his mother came to the magistrate's office to take out a warrant against Days' then-girlfriend, Cindy Artis, for making threats against Stella Days.

55.    Captain Sharp recalled seeing Days on November 20, 1996, when, sometime in the afternoon, he drove a marked police car to the Days residence after Stella Days complained that Cindy Artis was trespassing and making threats. Captain Sharp also recalled that Days (who according to the prosecution's theory had just committed two murders and fled from New York) did not appear frightened, nervous or otherwise fazed by the detective, and Captain Sharp did not notice any cuts or bruises on Days' hands, face, or anywhere else.

56.    Donald Evans recalled, with the aid of a personal calendar he kept from November 1996, that on November 19, 1996, Days assisted him in moving lawn furniture he purchased from Days' mother's home to Evans' home.

57.    Melody Webb recalled that in November 1996, she saw Days almost every day in the post office.

58.    Cindy Artis recalled that she saw Days virtually every day while they were dating in November 1996, and does not recall Days ever traveling to New York or talking about Harris.

### Days' Arrest and Cherilyn Mayhew

59.    Before Days' arrest in 2001, the police pursued many leads.  None pointed to Days.  Nor did the early leads result in charges being filed, and the case was declared a "cold case."

60.    Notably, Harris was 78 when he died, and many people had motives to kill and rob him.  He boasted of his wealth and that he left cash and valuables in his home. He also had potential enemies that would want to kill him with a vengeance, consistent with how he was bludgeoned to death.  He was a nasty man and a known racist, with a history of abusing his healthcare aides over the years, and many of them were minorities.  And, he was estranged from his children who he cut out of his will.

61.    At approximately 11:00 am on February 15, 2001, nearly five years after the murders, Days was arrested in Mount Vernon, New York on an unrelated charge. Days was arrested when an ex-girlfriend, Cherlyn Mayhew, and her new boyfriend, Darnell Getter, reported that he had violated an order of protection and threatened her.  Days was then brought to the Mount Vernon Police Department.

62.    While Days was in custody, Mayhew called the police again, this time anonymously, and blamed Days for two Eastchester murders without providing further detail. The Mount Vernon police officer who fielded the call knew of only two unsolved murders in that town:  those of Harris and Ramcharan.  The officer contacted the Eastchester Police Department

around 3:00 p.m., and two of the primary detectives who worked on the Harris and Ramcharan

murders—Lt. Mario Astarita and Sgt. Matthew Kiernan—arrived at Mount Vernon to interrogate

Days.  They were eventually joined by a third detective who had worked the case—Det. George

Barletta—shortly after midnight, while the interrogation was taking place.

63.    These detectives knew the crime scene intimately, as they had each been to the

house, seen the victims, and helped to collect evidence.  They also knew Days' mother, Stella

Days.  Mrs. Days had at one time been a home healthcare aide to Harris, and was one of at least

two former aides to have accused Harris of sexual assault.  Barletta had arrested Harris for that

alleged misconduct, and—following Harris' death—testified on behalf of Mrs. Days in a civil

lawsuit she brought against the Harris estate.

64.    At the request of Defendant Detective Christopher Calabrese of the Westchester

Police Department, and Defendants Astarita and Kiernan of the Eastchester Police Department,

the local Mount Vernon police delayed processing of Days for court as Astarita and Kiernan

began to interrogate him about the murders and while Calabrese tracked down the anonymous

caller. Mayhew was the obvious choice as she was the victim on the violation of order of

protection case.

65.    Calabrese confronted Mayhew near her residence and demanded that she come to

the police station to submit to an interview.  Calabrese treated Mayhew as if she did something

wrong and may be in trouble and that she was obligated to go to the precinct. Once at the Mount

Vernon Police Department, Calabrese separated Mayhew from her current boyfriend Darnell

Getter and escorted Mayhew upstairs alone as Getter waited downstairs.  Calabrese began to

question Mayhew in an accusatorial way about her anonymous call, and he gave her the

impression that if she did not stick by her story that Days did the Eastchester murders she would

remain in custody and may be arrested. At approximately 10:30 pm, when a break was taken in the interrogation of Days, Astarita and Kiernan joined Calabrese in the questioning of Mayhew.

66.    Mayhew was not credible which was palpably obvious to Calabrese, Astarita and Kiernan, given her demeanor and her initial attempts to deny and denounce what she stated on the anonymous call.   She also had a motive to falsely implicate Days, and Calabrese, Astarita and Kiernan knew it.  She was living with a new boyfriend then, Days was in violation of an order of protection requiring him to stay away from her, and she called the police to complain about Days.  It was also public knowledge that Harris and Ramcharan were murdered in Eastchester, that Harris molested Stella Days, Selwyn's mother, and that Harris was arrested for this crime.

67.    Mayhew was also fearful of the police, caused by Calabrese's overbearing demeanor and the influence he exerted over her with the threat of arrest.  This was a strategy employed by Calabrese to have her maintain and elaborate on her dubious report that Days committed the Eastchester murders.  This deliberate strategy further undermined the credibility of Mayhew's account.

68.    Motivated to solve a cold case Calabrese, Astarita, and Kiernan, ramped up the pressure on Mayhew. Making it appear that she was not free to go and using the weight of the situation to intimidate her, Mayhew, under pressure, reiterated the false account made on the anonymous call.  Calabrese, Astarita, and Kiernan knew or should have known that her account was unreliable or false.

69.    On information and belief, with prodding from Calabrese, Astarita, and Kiernan, and pressure for her to go along with the program, Mayhew provided additional false details about Days telling her that he was responsible for the murders.

70.    After Mayhew rehearsed the story and Calabrese, Astarita, and Kiernan felt she could appear to be plausible, they videotaped her. The questioning of Mayhew lasted an hour or more and was not recorded, except for the final ten minutes.

71.    Calabrese, Astarita, and Kiernan provided Mayhew's unreliable and false account to prosecutors with the Westchester County District Attorney's Office, the agency responsible for prosecuting Days. In providing the account to prosecutors, Calabrese, Astarita, and Kiernan omitted facts that indicated how unreliable Mayhew was; omitted the manner in which Mayhew was pressured into sticking to her initial unreliable account; omitted the prodding of Mayhew to create an elaboration of her unreliable and false account; and failed to tell prosecutors that Mayhew was an unreliable source about Days involvement in the Eastchester murders.[2]

---

[2] As discussed in the Procedural History below, Days was tried five times before he was finally acquitted and exonerated. The history of Mayhew's testimony and involvement in the various trials further demonstrates her unreliability. Mayhew only testified about Days supposed admission to her at the first trial in 2003. That trial ended with a mistrial, indicating that at least a portion of the jury distrusted her account. After the first trial, Mayhew began to back away from her accusation and refused to cooperate with the prosecution. Each trial thereafter, she either refused to come to court, testified partially and not about the "admission" or was found in contempt and unavailable, or unavailable due to memory loss, or emotional problems, thus causing her prior testimony from the first trial about the "admission" to be read to the jury in the absence of confrontation. Before fifth trial, mental health records were obtained that indicated that Mayhew felt intense pressure by State actors to stick to her initial account, and part her therapy focused on the anxiety caused by the State's pressure. Notably, the only time she testified live about the "admission" and was cross-examined on it – at trial one – the jury could not convict. And, in fifth trial when a more fulsome record about her history was admitted along with her prior testimony, the jury acquitted.

Moreover, when reversing Day's conviction after the fourth trial, the Appellate Division marginalized Mayhew, noting that she delayed telling the police about the alleged admission and only raised it months later when she had Days arrested for violating an order of protection. *People v. Days,* 131 A.D.3d 972, 981 (2015).

**The Police Interrogation and False Confession**

72.     At or about 5:00 pm on February 15, 2001 before Mayhew was brought in, Astarita and Kiernan began interrogating Days.  No attorneys were present.

73.     Although he was 34-years-old at the time, he had the IQ of a second grader (75) and scored in the "borderline" range in a series of intelligence tests, with significantly below average intelligence, and he is highly suggestible and compliant. Days also had a history of psychological disorders (he had been hospitalized on more than one occasion and took anti-psychotic medication).  Indeed, he was treated for mental illness around the time of his arrest, and after the interrogation he was prescribed antipsychotic medication by Correctional Health Services upon his admission right after the interrogation.  Days also suffered from Lupus, which caused brain damage, and for which he was also treated with medication.

74.     Days was questioned until approximately 10:30 pm.  Between 5:00 pm and 10:30 pm, the police declined to record any part of this interrogation, despite the fact that the room was set up for audio and visual recording.  The decision not to record was made by Astarita, Kiernan, and Calabrese.

75.     At about 10:30 pm, Days was temporarily returned to his prison cell, while Calabrese, Astarita and Kiernan took a break to interview Mayhew, who by that time had been identified as the anonymous accuser and was brought to the station for questioning.

76.     Around midnight, Days was retrieved by the detectives from his cell for further questioning.  Astarita and Kiernan continued to question Days without recording it until 1:42 am, despite the opportunity to do so.  In fact, during this one-hour and 42-minute period Calabrese was in an adjacent room with recording equipment watching the interrogation through a monitor because a camera was focused on Days; and Calabrese,  Astarita, and Kiernan, and  Defendant

14

Detective George Barletta, who arrived at the police station after midnight, conspired to not to record Days until he was ready to make a confession on video that could seem plausible.

77.    Notably, Barletta, who like Astarita and Kiernan was from the Eastchester Police Department, was introduced into the interrogation because he had knowledge of the crime facts and to build a rapport with Days based on his prior relationship with Days' mother Stella Days.

78.    Leveraging Barletta's relationship with Mrs. Days, Barletta, Astarita and Kiernan eased Days' path to false confession by suggesting that avenging his mother's sexual assault was a laudable reason to kill Harris, especially since, as the detectives also suggested, Days only intended to confront Harris about the sexual assault initially and not kill him. These minimization efforts employed by Astarita, Kiernan and Barletta began before the videotaping and continued throughout the video.

79.    Before the video recording, Astarita, Kiernan, and Barletta, threatened Days with the death penalty if he did not confess and provided details to Days about the crime that he did not know enabling him to construct a false confession.

80.    Before the video recording Barletta also threatened physical harm to Days and his family if he did not confess.

81.    In addition, before the video recording Astarita (and on information and belief Kiernan, and possibly Barletta) rehearsed the story with Days and prepared him so he could confess on video to what could plausibly appear to be a truthful confession.  Indeed, Astarita actually admitted under oath that he went over Days' story, at least once, before the videotaping.

82.    At 1:42 am on February 16, 2001, after approximately six and a half hours of questioning and sixteen hours of custody, and believing Days was as ready as he could be for the "show," Calabrese commenced videotaping.  In the video, Days can be seen telling Astarita,

Kiernan and Barletta primarily what they wanted to hear, namely that he was responsible for the murders and with some details they fed him that fit the crime scene evidence.

83.    Days' recanted his confession shortly after it was made.

84.    Although the Individual Defendants were interviewed by prosecutors about Days' confession before indictment and throughout the prosecution, they all lied to prosecutors about the nature of confession and made it seem like the confession was obtained without misconduct.

85.    They also omitted critical information to the prosecutors. None of the Individual Defendants revealed that they provided crime facts to Days to form his confession before the videotaping.  They failed to mention the extent of their focus on the moral justifications – avenging Mrs. Days' molestation and that Days did not at first intend to hurt Harris – to persuade him to falsely confess. They did not state that Days was threatened with the death penalty or that he and his family were threatened with physical harm if he did not confess.  They did not disclose that they actually could have videotaped the entire interrogation and gave a false story about why they could not videotape earlier.  And, they failed to explain that they conspired to hold off on videotaping until they rehearsed the confession with Days and got to a point where his confession would have the illusion of credibility before they videotaped. Thus, prosecutors were left with a videotaped confession that was unreliable and the result of police misconduct, without knowing so.[3]

---

[3] Although Astarita would later admit to the rehearsing, this revelation did not occur until 2011 when Astarita was being cross-examined by counsel for Days.  This was long after indictment and after the Westchester County District attorney was already invested in the prosecution and its knowledge of the confession continued to be compromised by the withholding of other information by the Individual Defendants about their widespread misconduct.

86.    The Individual Defendants did not document their misconduct. They also lied in various police reports and in conversations with prosecutors about their misconduct and about the methods they used to coerce statements from Days and Mayhew.

87.    On the basis of the false and unreliable information from Mayhew and the false and unreliable confession from Days, and the withholding of police misconduct and the true nature of how this evidence was obtained, Days was indicted and prosecuted for the murders of Harris and Ramcharan.

88.    Even independent of the unreliable Mayhew information, because of the improperly acquired confession prosecutors were able to successfully and unfairly exploit Day's confession before the grand jury, during the prosecution (and at suppression hearings), before the jury in Days' numerous trials, and before judges for sentencing.

**Improper Interrogation Practices and Lack of Interrogation Training**

89.    The conduct of Defendants was a gross violation of well-established police practices. It is improper for detectives to tell witnesses or suspects details about a case during questioning because it taints their statements, and makes it impossible (independent of witnesses and suspects who normally are disbelieved over police officers) to determine what information came from the witnesses' or suspects' actual memory and what information came from the detectives. By including information that the Days did not know, Defendant Astarita, Kiernan and Barletta not only perpetrated a fraud when claiming that the statements came from Days, but it made it virtually impossible for defense counsel to convincingly argue, and for prosecutors to determine, that the statements were fake. This problem was exacerbated by the fact that the Individual Defendants affirmatively lied to the prosecutor and perjured themselves in court proceedings to make it appear that the statements were voluntary when they in fact were coerced. These tactics also included, among other things, building a rapport and developing a false trust

17

with Days, minimizing the crimes by suggesting there was a moral justification for it, suggesting

that he would receive leniency if he confessed, threatening harm to him and his family if he did

not confess, all the while maintaining a façade that they believed in Days' guilt and holding him

captive until he falsely confessed.

90.    Because the crime scene was replete with forensic evidence, all of which excludes

Days, including DNA evidence that actually points to other perpetrators, and that the strong alibi

evidence proved Days was in North Carolina when the murders occurred, it is apparent that Days

is innocent.  Conversely, it cannot reasonably be in dispute that the Individual Defendants

manufactured the confession using coercive and improper interrogation techniques, including

contaminating the confession with facts known to the police and not Days.

91.    It is axiomatic that officers such as Astarita, Kiernan, Barletta and Calabrese

would face situations where they would interrogate suspects, and that it was essential to their

work that they obtain truthful confession.

92.    Nevertheless, Astarita, Kiernan, Barletta and Calabrese had little or no training on

the subject and no training whatsoever on how to *not* elicit false confessions, and they were

essentially left to fend for themselves in a situation that the Eastchester and Westchester Police

Departments knew or should have known its officers would encounter and that it knew or should

have known was fraught with peril and required specialized training.

93.    To see and hear the "confession" raises serious questions about the interrogation

process and the lack of training the officers had in obtaining a truthful confession.

94.    The questions are leading and suggestive, and Days, who is handcuffed

throughout the recording, appears exhausted, giving answers which are riddled with confusion

and inconsistencies.  Despite the fact that the police had already reviewed the story with Days

18

prior to the recorded portion of the interrogation, he still was unable to coherently repeat the story.

95.    The video demonstrates that this was not a case where Days volunteered details about the crime that "only the killer would know."  Rather, the recording reveals that most of the unique facts about the crime were told or suggested to Days by Astarita, Kiernan and Barletta rather than the other way around.  Indeed, it shows overt leading for the obvious purpose of causing Days to conform facts to the crime scene that he did not know, and it betrays that improper interrogation practices were used, not only on the video but, implicitly, during previous unrecorded interactions.

96.    By example, an exchange about when the crime occurred illustrates, Days lack of knowledge of the crime and the efforts by Astarita, Kiernan, and Barletta to unfairly steer him to say it took place in or about November to have him falsely conform his story on camera to the crime facts.  Astarita asks Days, "Do you remember the month?", to which Days replies, incorrectly, "It wasn't cold outside. It wasn't even cold.  I don't know if it was springtime or summer. It wasn't cold." Then Barletta interjects, "Then go by the holidays. Was it Christmas time? Thanksgiving time? Halloween?", which are on or around November instead of suggesting spring or summer holidays that would have been consistent with what Days was saying.

97.    Other examples include the following:

- Kiernan asked Days, "Where was the dog?"; suggesting a dog was present.

- Barletta asked Days, "When you came in to the house do you remember what room that was in you come into?" Days responded uncertainly, "The room was not big.  It looked like a—" Before he could guess, Barletta asked "Like a kitchen?"; suggesting you can enter into a kitchen.

- In addressing with Days the weapon used to bludgeon Harris, Kiernan asked him, "With what? The bat?"; suggesting that Harris was beaten with a bat.

- Kiernan also suggested to Days that the crime scene had been staged after the murders, which was their theory. He asked, "After – after you did this stuff now, do you remember what you were thinking? Do you remember you were thinking that you have to make it look like something else happened there? Does that bring back any memories?"

- Focusing on activity in the basement as the crime scene indicated, Astarita told Days, "You walked downstairs you got some stuff, you brought it up. Remember?" Before Days could respond, Kiernan said, "Do you remember going through the house?" And again, before Days could respond, Astarita asked: "Do you remember going down the steps…" Kiernan added "[t]o the basement?"; and again, before Days could respond, Astarita told Days "[t]here's an elevator on the steps. You went downstairs you brought some stuff up."

- Kiernan told Days that, "[i]t was dark. You did, you did do other stuff [to] her. You remember putting the plastic bag over her head. You remember? You remember that don't you?"; suggesting that a plastic bag was placed over Ramcharan's head.

    98.    Significantly, every fact Days stated that was consistent with the crime evidence

the interrogating detectives, Astarita, Kiernan, and Barletta already knew.

    99.    And, to the extent Days volunteered any facts about the crime that the

interrogating detectives did not already know, his claims were patently false. For example:

- Days stated that he had parked his car on the side of Harris' house and entered the house through a side door which he "clipped" to gain entry.

- Days told the police that upon entering the house, he confronted Harris regarding the alleged sexual assault against his mother. Harris allegedly attacked Days with a bat, cut Days' head open, and knocked him to the floor. Days said he feigned unconsciousness, and then performed a "clutch move" on Harris (this is a move that, as Days' explained, "locks the whole body up", and that he allegedly learned in his "Marine Corps training") and flipped Harris over before beating him up.

- Days stated that Ramcharan was wearing a white uniform.

- Days told police that he had tied both victims up with cord in an effort to stage the crime scene as a botched robbery.

- Days told police that he had traveled to the Harris house with a woman named Sandra in a "powder smoke blue" Pontiac Trans Am.

- After the murders, Days said that Sandra came into the house, joked that Days was a "butcher", and then left the crime scene with Days. Days told the police he dropped Sandra off at an abortion clinic in New Rochelle, and then drove to Queens where he

stayed for several hours, before returning to his mother's house in Mount Vernon, where he claims he got drunk in the driveway. He claims to have been pulled out of his car by his brother, then slept for several hours on the couch inside the house. He then decided to drive to North Carolina, but his car broke down in a town called "Pines Grove" in New Jersey. From there, he took an Amtrak train to North Carolina, completing his multiday odyssey from the crime scene.

100.    None of these things happened.

101.    Days could not have parked on the side of Harris' house because it was abutted by houses on both sides and Days did not even have a driver's license at the time; Harris' house did not have a side door, and the doors that it did have showed no sign of forced entry; Harris was so infirm that he could barely walk, much less attack Days with sufficient force to knock him to the ground; no blood from Days was found at the crime scene consistent with Days being struck in the head as he said, and Det. Sharp from Goldsboro said that he did not see any wounds on Days; and Harris' post-mortem examination did not reveal any signs of pressure or bruising which would be expected on an elderly person who had been choked.

102.    Ramcharan was wearing a purple tee-shirt when she was killed, not a white uniform. None of Harris' neighbors on Berkley Circle recalled seeing a person fitting the description of Sandra or a blue Pontiac at the house or in the neighborhood on those days. And there is no evidence that any of the elaborate post-flight journey actually occurred, despite the fact that the police searched extensively for evidence.

103.    Moreover, Sandra was located by the defense and testified that her trip with Days to the abortion clinic occurred a decade earlier, and she had not seen him since that time showing that he confabulated this event during the interrogation; it was also stipulated at trial that Stella Days' home in Mount Vernon was vacant at the time of the murders, so Days could not have stayed there as he claimed.

104.    Indeed, at the various trials, none of the Defendants revealed a single *verifiable fact* about the murders that the police did not already know, a telltale sign that Astarita, Kiernan and Barletta fed facts to Days to cause a false confession.

105.    Dr. Richard Leo, a leading forensic expert on false confessions analyzed the case. He opined that Days' individual vulnerabilities raised in addition to situational factors heightened the risk of false confession.

106.    As to the situational factors, Dr. Leo emphasized the length of the interrogation, the leading nature of the questioning, and the rapport building techniques utilized by the police. One of these techniques, also known as "minimization", involved raising to Days a moral justification for the murders – to avenge the fact that Harris molested Day's mother.

107.    Showing the potential for police contamination, Dr. Leo found it significant that the police were aware of every pertinent crime fact Days stated in his confession and could not verify a single fact Days imparted that they did not already know.

108.    Dr. Leo also highlighted the types of leading questions captured on the video which were apparently designed to get a confession, not necessarily the truth, and that many of the facts Days volunteered and that the police detectives did not feed him did not fit the crime facts.

109.    Despite the known hazard that untrained police officers could cause false confessions through improper interrogation, the Eastchester and Westchester Police Departments ignored the hazard up until February 15, 2001, by utterly failing to provide any meaningful training to its officers to avoid the elicitation of false confessions.

110.    The failure to train and indifference to it constituted a policy and practice against obtaining truthful confessions and caused and/or contributed to the false confession and the unfair prosecution, unfair trials and wrongful conviction of Days.

### Hostility and Racism in the Eastchester Police Department, and the Failure to Correct or Discipline

111.    To make matters worse, the Eastchester Police Department fostered and tolerated a culture of hostility toward suspects and criminal defendants, and African American suspects and criminal defendants in particular.  And, as an African American suspect and criminal defendant, Days was in an especially vulnerable position.

112.    Eastchester is a predominantly white suburb of New York City and White Plains and a culture exists within the Eastchester Police Department and among its officers to have an "us against them" mentality that marginalizes poor people and people of color, and African Americans in particular.

113.    Based on information and belief this culture and mentality is systemic, the Eastchester Police Department is aware of it, and it encourages it and/or does not make a meaningful effort to stop it or correct it.

114.    In addition, this culture and mentality negatively impacts the fairness and integrity of the work of the Eastchester Police Department in general, and it negatively impacted the fairness and integrity of the work of its officers in this case.

115.    More specifically, Defendant George Barletta, who played a central role in the interrogation and prosecution of Days, is a known racist.  In addition, Timothy Bonci is the current Chief of Police for the Eastchester Police Department and was a high-ranking member of the Department at the time of Days' arrest and interrogation and continued to advance in rank throughout the prosecution of Days' case.  As Chief, Bonci knew of the racism in the

Department and the racism of Barletta in particular, yet he did nothing meaningful about it or to correct it.

116.    By way of example, in February 2011 around the time of his testimony in trial three in this case, Barletta was the recipient of a racist email from another police officer mocking African American criminal defendants.  The email, which had the subject "Shower Sex" contained the following:

> In a recent survey, reportedly conduct by Elon University, African-Americans have proved to be the most likely to have had sex in the shower!
>
> A huge majority, 86%, of African-Americans said that they have had sex in the shower.
>
> The other 14% said that they hadn't been to prison yet.
>
> Sort of brings tears to your eyes doesn't it?

117.    But far from denouncing this obviously offensive and racist viewpoint, Barletta, thinking it was funny, and fearing no repercussions for airing racist views, forwarded the email to Chief Bonci.  And, instead of denouncing it or sanctioning or disciplining Barletta, Bonci, at a minimum did nothing, indicating that racism was tolerated and part of the culture of the Eastchester Police Department.

118.    Other similar emails that pre-date and post-date the "Shower Sex" email between Barletta and Bonci reinforce the point.  Previously, in August of 2011, Barletta received an email criticizing Hispanic illegal aliens for not paying taxes and for taking advantage of the system, which he also forwarded to Chief Bonci.  That email, with the subject "Joe Vs Jose", states, among other things:

> Joe Legal's and Jose Illegal's children both attend the same school. Joe Legal pays for his children's lunches while Jose Illegal's children get a government sponsored lunch.  Jose Illegal's children have an after school ESL program. Joe Legal's children go home.

> Joe Legal and Jose Illegal both enjoy the same police and fire services, but Joe paid for them and Jose did not pay.
>
> Do you get it, now?
>
> If you vote for or support any politician that supports illegal aliens… You are part of the problem!
>
> It's way PAST time to take a stand for America and Americans!

(emphasis in original).

119.    At a minimum, this anti-immigrant email and the forwarding of it by Barletta to Chief Bonci, indicates the type of marginal and hostile views that Barletta and likely Bonci held about illegal aliens that officers such as Barletta and others in the Eastchester Police Department would come into contact with and be called upon to protect as victims of crime or to investigate as potential criminal suspects. It also shows that the existence and exchange of such ideas are tolerated and part of the culture of the Eastchester Police Department.

120.    The pre-"Shower Sex" email, also demonstrates the latitude Barletta had to disseminate the subsequent racist ideas contained in the Shower Sex email to the Chief of the Eastchester's Police Department, the toleration of those ideas inside the Department, and the culture of hostility and prejudice inside the Department where offensive ideas can be so freely exchanged without concern or fear of discipline.

121.    Then, after the "Shower Sex" email, in May of 2012, Barletta again sent a racist email to Chief Bonci.  This email, subject "The New Breadwinner In The Family", features a photograph of an African American woman with several African-American children surrounding her and it mocks African American women for taking advantage of the welfare and foster care systems.

122.    It also states, "**Worse, the Muslims have been paying attention**", and will catch on, "**replace the voting bloc**", and "**run[] this country within 25 years.**"  And, it expresses an adversity to paying taxes ending with:

> **Read the above again, until it sinks in, and then ask yourself if your Children, Grandchildren, and Great Grandchildren will survive these severe changes to America!!!**
>
> Are You alarmed yet?
>
> Is anybody listening?
>
> Is this a **Great Country** or what…?
>
> Don't forget to pay **your** taxes!

(emphasis in original).

123.    At a minimum, this email, in addition to expressing hostile views toward people of color, shows that emails like the instant one and the previous racist Shower Sex and anti-immigration emails and the views they propound are accepted and encouraged in the Eastchester Police Department; thus indicating a culture of hostility and racism in the Department that would interfere with and compromise the integrity of criminal investigations such as the instant case and the fairness of the treatment of suspects such as Days, who is African American.[4]

124.    Demonstrating an acceptance and even encouragement of hostility and racism in the Eastchester Police Department, Chief Bonci, with full knowledge of Barletta's viewpoints and his receipt of the offensive emails took no action to discipline Barletta.

---

[4] The offensive emails and their attribution to Barletta and Chief Bonci surfaced in news articles in 2015, and were raised during Days' fifth trial in August of 2017 when Barletta was asked about them. He confirmed that the email address that forwarded the emails to Chief Bonci, GJB853@aol.com was his; however to cover-up his knowledge of, at least, the Shower Sex email and of transmitting it to Chief Bonci, Barletta lied under oath about never seeing the email.

125.    And Chief Bonci chose to take no action even though the offensive emails became public in the press and a lieutenant from the nearby Pelham Manor Police Department, who was part of the email chain, was suspended for two weeks.  Bonci's inaction in the face of the public scandal and the discipline of the officer in the Pelham Manor Police Department sent a message to others in the Eastchester Police Department that such behavior was tolerated, and is indicative of the systemic culture of racism.

126.    In fact, in October of 2017, Chief Bonci specifically recommended Barletta for a promotion to captain and touted his qualifications as a career police officer.

127.    This acceptance and tolerance of the systemic hostility and racism in the Eastchester Police Department, constituted a policy and practice of hostility and racism toward suspects and criminal defendants, such as Days who is African American, and it, independently and in conjunction with the failure to train about how to avoid eliciting false confessions, contributed to the false confession and wrongful prosecution and conviction of Days.

### Loss or Destruction of Evidence

128.    Unfortunately, Days' efforts to develop exculpatory evidence and find the true killer were thwarted by Defendants Astarita, Kiernan, and Barletta, the Detectives in the Eastchester Police Department who continued to work on the case after Day's arrest.

129.    A fingerprint located on a roll of tape also found in the basement near the chair were Ramcharan was tied up, and the Caucasion head hair found on Harris' sock, both likely to yield useful DNA results were lost or destroyed or caused to be lost or destroyed by Defendants Astarita,  Kiernan, and Barletta and therefore could not be tested by the defense.  Because this evidence was collected during a criminal investigation and was undoubtedly relevant, and indeed likely exculpatory (or inculpatory), Defendants Astarita, Kiernan, and Barletta had a duty to

preserve it. The significance of these items and their connection to the true killer cannot be overstated.

130.    Ramcharan was suffocated and tortured.  She was found with a plastic bag secured over her head with translucent tape. The lost tape from the basement was the same kind of tape found on Ramcharan's head.  The print was lifted from the end of the roll in the area were someone tearing the tape would place their finger.  And, the surface of the tape where the print was left was sticky and ideal for the depositing of DNA.

131.    The lost head hair on Harris' sock was that of a Caucasian male (not Days' who is African American) and it was not Harris.'  If preserved as required, it could have been subjected to mitochondrial DNA testing to link the hair to the real killer(s).

132.    Given the significance of the lost or destroyed evidence to the case and its high likelihood to exculpate Days, Defendants' obligation to preserve it, the misconduct of Defendants Astarita,  Kiernan, and Barletta surrounding the interrogation of Days, and the culture of hostility and racism in the Eastchester Police Department, it is alleged that Defendants acted in bad faith to lose or destroy this evidence to undermine Days' case and opportunity for dismissal.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 Claims for Violations of the Right to a Fair Trial and to Due Process of Law under the Fourth, Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution**

**(Against Individual Defendants)**

133.    Days hereby incorporates and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein and further alleges as follows.

134.    On or about February 15, 2001, Calabrese, Astarita, and Kiernan  improperly coerced and manipulated Mayhew to falsely implicate Days in the Eastchester murders, by

28

among other things, taking advantage of her current dislike for Days due to the violation of the order of protection, placing her in an environment where she felt she was not free to go, isolating her and from making it seem she could not leave or would get into trouble if she did not implicate Days in the Eastchester murders, rebuffing her denials about the untruthfulness of the anonymous call, intimidating and pressuring her under the gravity of the situation to stick to and elaborate on the call, and leveraging this false evidence to make the false confession of Days seem more credible than it was.

135.    On or about February 15, 2001, Calabrese, Astarita, and Kiernan suppressed valuable evidence about the unreliable Mayhew information by failing to videotape the pre-taping portions of her interview, and they created a misleading and false impression of the quality of her information by only recording and providing to prosecutors the prepared and taped version of her account.

136.    Independent of and collectively with the Mayhew information, on or about February 15 and 16, 2001, Astarita, Kiernan, Barletta improperly coerced and manipulated Days to falsely confess to the Eastchester murders by, among other things, taking advantage of Days' low intelligence, cognitive deficits, compliant nature, suggestibility, mental illness, and psychological vulnerabilities; using threats of physical harm to him and his family; threatening him with the death penalty; creating and exploiting a moral justification – namely avenging the molestation by Harris of his mother; minimizing the severity of the false account by suggesting that he only went to the house to confront Harris, not to kill him, and that things got unexpectedly out of hand; contaminating the confession by feeding him facts about the crime that they knew and he did not so he could incorporate them in to the confession; and rehearsing the false story to create the illusion that the confession came from Days when it came from them.

137.    On or about February 15 and 16, 2001, Astarita, Kiernan, Barletta and Calabrese conspired not to videotape the interrogation of Days, despite having the capacity to do so, in an effort to hide the improper conduct Astarita, Kiernan, and Barletta  employed to get Days to falsely confess, and they conspired to only video tape when Days was prepared to give the semblance of a confession that looked as if it was coming from him and not Astarita, Kiernan, Barletta.

138.    The Individual Defendants, who were police officers at the time of their actions, knowingly forwarded false information to prosecutors (verbally and in written reports) about the nature of, and the manner in which they collected, the Mayhew information and the Days' confession and they omitted in their discussions with prosecutors the coercive and deceptive techniques they used to get the unreliable and false information to undermine prosecutors decision making about the efficacy of the case,  causing prosecutors  to unfairly prosecute, try and convict Days.

139.    The forwarding of the false information and the omission of the truth to prosecutors by the Individual Defendants caused prosecutors to conceal exculpatory evidence to Days that he could have used to defend himself during his prosecution and at his trials.

140.    The forwarding of the false information and the omission of the truth to prosecutors by the Individual Defendants was likely to influence a jury's decision and undermine confidence in the outcome of the trial.

141.    The forwarding of the false information and the omission of the truth to prosecutors by the Individual Defendants violated Days right to a fair prosecution, to r fair trials, and to fair sentencings.

142.    Furthermore, the Individual Detectives failed to timely disclose material favorable to the defense in contravention of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny.

143.    The Individual Defendants acting individually and in concert and conspiracy, deliberately, and recklessly.

144.    Contributing to the improper actions and inactions of the Individual Defendants was the tolerated culture of hostility and racism in the Eastchester Police Department.

145.    No reasonable police officer in 2001 or thereafter would have believed that the actions of the Individual Defendants were lawful.

146.    As a direct and proximate cause of the actions and inactions of the Individual Defendants, Days was wrongfully charged, prosecuted, convicted, and sentenced (deprived of liberty) in violation of his clearly established constitutional rights to a fair trial and due process of law under Fourth, Fifth,  Sixth and Fourteenth Amendments of the United States Constitution.

147.    Consequently, the Individual Defendants are liable to Days under 42 U.S.C. § 1983 for damages.

### SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Violations of the Rights Against Self-Incrimination under the Fifth and Fourteenth Amendments of the U.S. Constitution**

**(Against Individual Defendants)**

148.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and further alleges as follows.

149.    On or about February 15, 2001, the Individual Defendants Astarita, Kiernan and Barletta used coercive and manipulative interrogation techniques to cause Days to falsely confess and to become a witness against himself.

31

150.    The coercive and manipulative interrogation techniques used by the Individual
Defendants Astarita, Kiernan and Barletta included, among other things, exploiting Days'
vulnerabilities to induce a false confession; prolonging the duration of this custody and of the
interrogation to break his will; using lies, trickery and deceit; building a rapport and developing a
false trust with Days; feeding him facts about the crime that he did not know; minimizing the
crimes by suggesting there was a moral justification for it and that his initial intentions were not
that bad; suggesting that he would receive leniency if he confessed; threatening severe penal
consequences including the death penalty if he did not confess; threatening harm to him and his
family if he did not confess; and all the while maintaining a façade that they believed in Days'
guilt and that he would be held captive until he confessed.

151.    As a result of the Individual Defendants Astarita, Kiernan and Barletta's
deception, manipulation, and coercion, Days' will was overborne and his false confession was
not a product of his free will or rational intellect, and Days was deprived of his right not to be
compelled to become a witness against himself.

152.    The deception, manipulation, and coercion that caused Days' false and
involuntary confession was purposely concealed from prosecutors.

153.    Days' false and involuntary confession was forwarded by the Individual
Defendants to prosecutors and used against him by prosecutors to improperly and unfairly jail
him, indictment him, prosecute him, try him, convict him, and secure a sentence of 50 years to
life in jail, of which he served nearly 17 years.

154.    The Individual Defendants acting individually and in concert and conspiracy,
deliberately, and recklessly.

155.     Contributing to the improper actions and inactions of Astarita, Kiernan and Barletta, was the culture of hostility and racism in the Eastchester Police Department.

156.     No reasonable police officer in 2001 or thereafter would have believed that the actions of the Individual Defendants were lawful.

157.     As a direct and proximate cause of the actions and inactions of the Individual Defendants, Days was compelled to become a witness against himself, and was wrongfully charged, prosecuted, convicted, and sentenced (deprived of liberty) in violation of his clearly established constitutional rights against self-incrimination and due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

158.     Consequently, the Individual Defendants are liable to Days under 42 U.S.C. § 1983 for damages.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Malicious Prosecution and Deprivation of Liberty under the Fourth and Fourteenth Amendments of the U.S. Constitution**

**(Against Individual Defendants)**

159.     Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

160.     The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Days.

161.     The Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Days for the Eastchester murders.

162.     The Individual Defendants had an obligation to provide truthful information to prosecutors and Days about their investigation and to not omit material information and evidence.

163.    Nevertheless, the Individual Defendants covered up and lied to prosecutors about, and withheld from Days the improper nature of their investigation, the falsity and unreliability of the evidence against him, including the unreliable Mayhew information and Days' false confession, and withheld exculpatory and impeachment material under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

164.    Disclosure of the truth about the investigation would have revealed to prosecutors that they were without probable cause to indict and pursue the criminal case against Days for the Eastchester murders; and if the undisclosed misconduct and concealed unreliable and/or fabricated evidence and exculpatory evidence were made known after indictment, the grand jury's probable cause determination would have been vitiated.

165.    The Individual Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State of New York (a) not to falsify and fabricate evidence, (b) to disclose *Brady* and/or *Giglio* material to the Westchester County District Attorney's Office so that it could be disclosed to the defense and be used to prevent the conviction of Days based upon false, misleading, or incomplete evidence and argument, (c) to make truthful statements to prosecutors about the actual nature of the evidence and the existence of *Brady* and/or *Giglio* material, and (d) not to cause or continue Days' unconstitutional conviction and resultant injuries by lying and continuing to lie about such evidence.

166.    Notwithstanding their awareness of their duties, the Individual Defendants prior to, during, and following Days' trials, intentionally, recklessly, and/or with deliberate indifference to their legal obligations falsified evidence, coerced statement from a witness, coerced an involuntary and false confession from Days, suppressed their misconduct, concealed *Brady* and/or *Giglio* material from Days, and lied about their wrongdoing.

167.    The Individual Defendants acted with actual malice, as demonstrated by, among other things, their falsification of evidence, coercion of Mayhew and Days, suppression of their misconduct, and concealment of exculpatory and impeachment evidence.

168.    The prosecution terminated in Days' favor when all charges against him related to the Eastchester murders were dismissed after his acquittal on September 12, 2017.

169.    Upon information and belief, the Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Days' constitutional rights by failing to rectify one another's wrongful acts.

170.    The Individual Defendants acting individually and in concert and conspiracy, deliberately, and recklessly.

171.    Contributing to the improper actions and inactions of the Individual Defendants was the culture of hostility and racism in the Eastchester Police Department.

172.    No reasonable police officer in 2001 or thereafter would have believed that the actions of Individual Defendants were lawful.

173.    As a direct and proximate cause of the actions and inactions of the Individual Defendants, Days was maliciously prosecuted in violation of clearly established constitutional rights not to be unreasonably seized and deprived of liberty without probable cause under the Fourth and Fourteenth Amendments of the United States Constitution.

174.    Consequently, the Individual Defendants are liable to Days under 42 U.S.C. § 1983 for damages.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Pre-Trial Detention Without Probable Cause
In Violation of the Fourth Amendment of the U.S. Constitution**

**(Against Individual Defendants)**

175.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

176.    The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Days.

177.    The Individual Defendants objectively lacked probable cause to initiate criminal proceedings against Days for the Eastchester murders.

178.    The grand jury indictment was procured using objectively false information and is therefore irrelevant.

179.    As a result of the Individual Defendants initiation of criminal proceedings without probable cause, Days was held without bail pre-trial from his arraignment in February of 2001 until his first conviction on April 16, 2004, from December 31, 2009, after his initial conviction was vacated, until his second conviction on December 20, 2011, and from the second time his conviction was vacated, September 2, 2015, until his acquittal on September 12, 2017.

180.    The prosecution terminated in Days' favor when all charges against him related to the Eastchester murders were dismissed after his acquittal on September 12, 2017.

181.    Contributing to the improper actions and inactions of the Individual Defendants was the culture of hostility and racism in the Eastchester Police Department.184.  Consequently, the Individual Defendants are liable for damages under 42 U.S.C. § 1983 pursuant to *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017). Further, given that this cause of action sounds purely under the Fourth Amendment, malice and any other subjective belief of the Individual Officers is irrelevant.

## FIFTH CAUSE OF ACTION

**Claim under 42 U.S.C. § 1983 for Spoliation of Evidence in Violation of the Fifth and Fourteenth Amendments of the U.S. Constitution**

36

**(Against Individual Defendants Astarita, Kiernan and Barletta)**

182.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

183.    As the detectives assigned to working on the criminal case against Days for the Eastchester murders, Defendants Astarita, Kiernan, and Barletta had a duty to preserve relevant physical evidence that potentially exculpates Days, including the translucent tape with the fingerprint, and the Caucasian hair.

184.    Indeed, the significance of these items of evidence and their forensic value was obvious.  The translucent lost tape from the basement matched the tape found on Ramcharan's head; the fingerprint on it came from the end of the roll where a finger was likely to be; and due to its tacky nature was optimal for the depositing of DNA and thus have high evidentiary worth.

185.    The lost head hair on Harris' sock which he was wearing when he was murdered, was that of a Caucasian male, and did not belong to Days or Harris.  If preserved, as required, it could have been subjected to mitochondrial DNA testing to link the hair to the true killer and to exonerate Days.

186.    Nevertheless, these important items of evidence were lost or destroyed.  And, on information of belief, they were lost or destroyed by Individual Defendants Astarita, and/or Kiernan, and/or Barletta who were tasked with maintaining and preserving this evidence.

187.    Defendants Astarita,  Kiernan, and Barletta acted in bad faith in losing or destroying the evidence in that they were negligent, reckless or indifferent in the handling of the evidence and/or destroyed it as a part of concerted effort to cover up the vast misconduct raised above and to undermine Days potential for exoneration or to obtain a fair prosecution and/or trial.

188.    Indeed, the misconduct by Defendants Astarita, Kiernan and Barletta described above, the culture of hostility and racism in the Eastchester Police Department and Barletta's racism in particular is indicative, the obvious evidentiary value of the evidence to Days, and that it was lost or destroyed suggests that it was lost or destroyed in bad faith, recklessly or deliberately.

189.    The Individual Defendants acting individually and in concert and conspiracy, deliberately, and recklessly.

190.    The loss or destruction of the evidence violated Days right to due process of law under the Fourteenth Amendment of the United States Constitution.

191.    Consequently, Individual Defendants Astarita, Kiernan, and Barletta are liable to Days under 42 U.S.C. § 1983 for damages.

### SIXTH CAUSE OF ACTION

#### Claim under 42 U.S.C. § 1983 and
#### *Monell v. Department of Social Services of City New York,* 436 U.S. 658 (1978)

**(Against the Town of Eastchester for the Actions of the Eastchester Police Department)**

192.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

193.    The need for training of police detectives in techniques and/or procedures to avoid producing false confessions was obvious to Defendants Town of Eastchester and the Eastchester Police Department, at all times herein mentioned, including, but not limited to, the times Astarita, Kiernan and Barletta were hired and employed.

194.    It was equally obvious that the failure to provide such training and/or to institute such procedures would inevitably result in false confessions as police officers lacking the

requisite training are substantially more likely, whether intentionally or otherwise, to obtain false confessions.

195.    Defendants Town of Eastchester and Eastchester Police Department provided its police detectives, including but not limited to, Astarita, Kiernan and Barletta, with no and/or virtually no training in how to avoid eliciting false confessions and provided no and/or virtually no monitoring for such purpose.

196.    Defendants Town of Eastchester and Eastchester Police Department were deliberately indifferent to the need for such training and/or monitoring.

197.    The training of officers and detectives employed by Defendants Town of Eastchester and Eastchester Police Department including Astarita, Kiernan and Barletta (by coursework, written materials, or field work), at the times they were hired and up until and including 2001 contained no guidance as to techniques and/or procedures to avoid eliciting coerced and/or false confessions, and/or no prohibitions on particular techniques and/or practices that would produce a likelihood of such confessions.

198.    The training, on the other hand, involved instruction on improper techniques such as isolating suspects; interrogating them for long periods of time; giving a false impression to a suspect that the officers' believed that the suspect is guilty and that the only way out is to confess; creating within a suspect a feeling of despair; using lies, trickery and deceit to get a suspect to confess; and coaxing or manipulating confessions out of suspects, by, among other things, minimizing the crime and shifting blame, and/or threatening them with severe penal consequences if they did not confess.

199.    The recommended interrogation approaches given to trainees and officers on the job solely consisted of ways to bring about inculpatory statements, and included no instruction on how to avoid false ones.

200.    In 2001 Defendants Town of Eastchester and Eastchester Police Department had no written policies and/or guidelines regarding how to avoid false confessions and/or prohibitions on techniques and/or practices that would produce a likelihood of such confessions.

201.    At and around the time of the Days' interrogation in February 2001, detectives in the Eastchester Police Department would have markedly greater responsibilities for attempting to elicit confessions than would police officers of other ranks, such as patrolmen.

202.    At the times Astarita, Kiernan and Barletta were hired and/or became detectives, Defendants Town of Eastchester and Eastchester Police Department provided no and/or virtually no formal training or written materials to persons promoted to and/or assigned to the rank of detective on the subject of interrogation and how to avoid the elicitation of false confessions; nor was any such formal training or written materials provided to Astarita, Kiernan and Barletta up until February 15 and 16 of 2001, when Days was interrogated and falsely confessed.

203.    Up until February 15th and 16th of 2001, Defendants Town of Eastchester and Eastchester Police Department had no written policies and/or guidelines requiring the audio or video taping of suspect interrogations, while knowing that taping interrogations is critical and that potentially exculpatory evidence would arise during untaped portions of interrogations, and that it therefore should be preserved.

204.    Defendants Town of Eastchester and Eastchester Police Department retained and/or continued to engage personnel whom it knew or should have known would fail to act within the boundaries of the law, including the Individual Defendants.

205.    Defendants Town of Eastchester and Astarita, Kiernan and Barletta ignored misconduct by its employees, and did so for a prolonged period of time up until and past February 15th and 16th of 2001.

206.    The actions and inactions of Astarita, Kiernan and Barletta and their investigation of Days and the manner in which they interrogated him showed the consequences of the Defendants Town of Eastchester and Eastchester Police Department's deliberate indifference to the constitutional rights of suspects.

207.    Astarita, Kiernan and Barletta's misconduct was enabled by the improper departmental culture created by the Defendants Town of Eastchester and Eastchester Police Department's deliberate indifference to the risk of false confessions in the absence of good and sufficient training and/or monitoring.

208.    The Eastchester Police Department fostered and tolerated a culture of hostility and racism toward suspects and criminal defendants, and African Americans in particular, and such culture enabled and/or contributed to the improper actions and inactions and misconduct of Astarita, Kiernan and Barletta in their investigation of the Eastchester murders, the treatment of the Mayhew information and/or the interrogation of Days and the elicitation of his false confession.

209.    Evidencing the culture of hostility and racism in the Eastchester Police Department and the tolerance for misconduct was the failure to discipline Barletta in the face of the email scandal explained above.

210.    Also, evidencing the culture of hostility and racism in the Eastchester Police Department and the tolerance for misconduct was the advancement of Barletta in the wake of the email scandal explained above by pay increases and/or promotion which constituted a failure to

41

discipline and ratification of the hostile and racist behavior of Barletta and others in the Eastchester Police Department.

211.    Defendant Eastchester Police Department was at all relevant times the policymaker for whom the Defendant Town of Eastchester are liable.

212.    At all relevant times Defendant Town of Eastchester, through its policymakers, owed a duty to the public at large and to Days, which its policymakers knowingly and intentionally breached, or to which they were deliberately indifferent to.

213.    At all relevant times Defendant Town of Eastchester, through its policymakers failed to and were deliberately indifferent to implementing policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that violate the above described constitutional rights of criminal suspects and defendants.

214.    Consequently, for substantially causing the above-described violations of Days' constitutional rights set forth in the First through Fifth Causes of Actions, the Defendants Town of Eastchester and County of Westchester are liable to Days pursuant to 42 U.S.C. § 1983 for damages.

## SEVENTH CAUSE OF ACTION

### Malicious Prosecution Claim Under New York State Law

### (Against All Defendants)

215.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

216.    The Individual Defendants caused the commencement and continuance of criminal proceedings against Days.

217.    There was no probable cause for criminal proceedings against Days for the Eastchester murders, and the Individual Defendants knew or should have known as much.

218.    The unreliable and or false information was presented to the grand jury to create the illusion of probable cause and the Individual Defendants knew or should have known as much.

219.    Disclosure of the truth about the investigation would have revealed to prosecutors that they were without probable cause to indict and pursue the criminal case against Days for the Eastchester murders; and if the undisclosed misconduct and concealed unreliable and/or fabricated evidence and exculpatory evidence were made known after indictment, the grand jury's probable cause determination would have been vitiated.

220.    The Individual Defendants acted with actual malice.

221.    The criminal proceedings against Days terminated in his favor when he was acquitted and the indictment and all charges against him were dismissed on September 12, 2017.

222.    Defendants Town of Eastchester and County of Westchester are liable under the doctrine of respondeat superior for the unlawful conduct of its employees, the Individual Defendants.

223.    Consequently, Defendants are liable to Days for damages.

**EIGHTH CAUSE OF ACTION**

**Negligent Hiring, Training, Supervision, Retention, and Discipline
under New York State Law**

**(Against the Town of Eastchester and the County of Westchester)**

224.    Days repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

225.    Defendants Town of Eastchester and County of Westchester are liable to Days because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, retain and discipline its agents and/or employees employed by the Eastchester and Westchester Police Department with regard to the duties described above.

226.    The misconduct by Defendants Astarita, Kiernan and Barletta described above, the culture of hostility and racism in the Eastchester Police Department and Barletta's racism in particular evidences the failure to adequately hire, train, supervise, retain and discipline the Department's officers.

227.    Consequently, Defendants Town of Eastchester and County of Westchester are liable to Days for damages.

## NINTH CAUSE OF ACTION

### Violations of the New York State Constitution
### (Against the Defendants)

228.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

229.    By virtue of the aforementioned acts, the Individual Defendants are liable to Plaintiff for violating his right to due process under Article I, § 6 of the New York State Constitution, and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

230.    Defendants Town of Eastchester, Eastchester Police Department and Westchester are liable for these violations of the New York State Constitution under the principle of respondeat superior.

## DAMAGES

231.    As a direct and proximate cause of Defendants' actions and inactions, Days was deprived of his civil rights under the Fourth, Fifth, Sixth, and Fourteen Amendments of the United States Constitution and under the laws of New York.

232.    This action seeks damages from on or prior to February 15, 2001 through the present.

233.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, wanton and/or bad-faith acts and omissions of Defendants caused Days to be forced to make a statement against his will, maliciously prosecuted, unfairly tried, wrongfully convicted, unfairly sentenced, deprived of liberty, deprived of relevant and exculpatory evidence, and subjected to illegal searches and to abuse and indignities during his incarceration.

234.    Such acts and omissions of Defendants caused the following injuries and damages to Days which were foreseeable to Defendants at the time of the acts and omissions and which continue to date and will continue into the future: susceptibility to physical assaults and batteries and physical assault and batteries, physical injuries, pain and suffering, mental anguish, emotional distress, psychological damage, loss of liberty, loss of relationships, loss of family, loss of companionship, loss of consortium, loss of guidance, loss of emotional and psychological development, loss of maturing in a natural environment, loss of educational opportunity, loss of vocational training, loss of professional opportunity, loss of income, susceptibility to illness and illness, inadequate medical care, humiliation, embarrassment, degradation, and restrictions on diet, sleep, personal contact, athletics, personal growth and fulfillment, sexual activity, enjoyment and free expression.

235.    Such acts and omissions of Defendants entitle Days to compensatory and punitive damages.

**WHEREFORE**, it is respectfully requested that this Court grant judgment in favor of Plaintiff Against the Town of Eastchester, the Eastchester Police Department, County of Westchester, Mario Astarita, Matthew Kiernan, George Barletta, and Christopher Calabrese, in the nature of:

(A) Compensatory damages in an amount to be determined;

(B) Punitive damages in an amount to be determined;

(C) Pre-judgment interest as allowed by law;

(D) An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

(E) Such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        April 15, 2019

**GLENN A. GARBER, P.C.**


By: _____/s/_____
        Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
(212) 965-9370


**RICKNER PLLC**


By: _____/s/_____
        Rob Rickner

The Woolworth Building
233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 300-6506

**LORD & SCHEWEL PLLC**

By: _____/s/_____
       Abraham Rubert-Schewel

The Woolworth Building
233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 964-0280

*Attorneys for Plaintiff Selwyn Days*