**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
**SELWYN DAYS,**

       **Plaintiff,**

  -v-

**THE COUNTY OF WESTCHESTER**             18-CV-11538 (NSR)(AEK)
**and CHRISTOPHER CALABRESE,**
       **Defendants;**

**THE COUNTY OF WESTCHESTER**
**and CHRISTOPHER CALABRESE,**
       **Third-Party Plaintiffs,**

  -v-

**THE TOWN OF EASTCHESTER,**
       **Third-Party Defendant.**
---------------------------------------------------------------x

# MEMORANDUM OF LAW
# IN SUPPORT OF THIRD-PARTY PLAINTIFFS' MOTION
# FOR A DECLARATORY JUDGMENT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………..……………………………………………….1

BACKGROUND ………………………………………………………………………………..2

      *The 1995 Mutual Aid Agreement* …………………………………………………….2

      *The 1996 Eastchester Murders and Resulting Investigation* ……………………………...3

LEGAL STANDARDS …………………………………………………………………………...5

ARGUMENT ………………………………………………………………………………..…..6

I.     Eastchester is contractually obligated by the 1995 Agreement to defend the
       Third-Party Plaintiffs in the underlying action ………………………………………6

II.    Eastchester's proffered reasons for refusing to honor the Agreement
       lack merit……………………………………………………………………………7

       A.    Laches ......………………………………………………………………………7

       B.    "Intentional Wrongs or Reckless Conduct"……………………………………..9

       C.    Section 209-m of New York's General Municipal Law ………………………10

CONCLUSION……………………………………………………………………………..11

**TABLE OF AUTHORITIES**

**CASES**

*Beth Medrash Eeyun Hatalmud v. Spellings*, 505 F.3d 139 (2d Cir. 2008)................................. 5-6

*Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8 (2d Cir. 2019) ............................................................. 6

*Hotel Des Artistes v. Transamerica Ins. Co.*, No. 93-CV-4563 (SS), 1994 U.S. Dist. LEXIS 7800 (S.D.N.Y. June 10, 1994) ................................................................................................. 9

*Int'l Techs. Mktg. v. Verint Sys.*, 157 F. Supp. 3d 352 (S.D.N.Y. 2016)…………………………..10

*Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173 (2d Cir. 2019) ......................................................... 10

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990) ........................................ 6

*Port Clyde Foods, Inc. v. Holiday Syrups, Inc.*, 563 F. Supp. 893 (S.D.N.Y. 1982). ................................................................................................................. 5

*Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322 (S.D.N.Y. 2010) ..................................... 6

*Zuckerman v. Metro. Museum of Art*, 928 F.3d 186 (2d Cir. 2019) .............................................. 7

**STATUTES**

Federal Rule of Civil Procedure 57 …………………………………….…………1, 5

28 U.S.C. § 2201 …………………………………………………………………………………1, 5

N.Y. Gen. Municipal Law § 209-m....………………………………………………………..10

**PRELIMINARY STATEMENT**

The County of Westchester ("Westchester" or "the County") and Westchester police officer Christopher Calabrese ("Calabrese")—together, the "Third-Party Plaintiffs"—respectfully move the Court for a declaratory judgment pursuant to FRCP 57 and 28 U.S.C. § 2201. The judgment sought is simple—a declaration that the Town of Eastchester ("Eastchester") is obligated to defend them against Plaintiff Selwyn Days' remaining claims in the underlying action.

By stipulation dated February 8, 2022, Plaintiff agreed to dismiss all claims against the Eastchester defendants, along with all claims against Westchester and Calabrese except those predicated upon "intentional wrongs or reckless conduct." (*See* ECF No. 209-1; ECF No. 210 (so-ordered stipulation of dismissal).) On February 15, 2022, pursuant to this same stipulation, Westchester and Calabrese filed a third-party complaint against Eastchester, asserting claims for declaratory relief, breach of contract, contractual and statutory indemnification, and contribution.[1] The so-ordered stipulation further authorized the instant motion. (*Id.*)

Only the first of the third-party claims, for declaratory relief, is at issue here. Specifically, Westchester and Calabrese seek a judgment declaring that Eastchester is obligated, by virtue of a 1995 municipal contract, to "provide defense for and defend" them against Plaintiff's remaining claims, at Eastchester's "sole expense." As set forth in the so-ordered stipulation (ECF No. 210), such a declaration would be dispositive of the entire case, because Plaintiff and Westchester have agreed to dismiss all remaining claims in that eventuality.

---

[1] Westchester originally proposed to assert these as cross-claims. At the request of the assigned U.S. Magistrate Judge, however, Westchester agreed to withhold them until Eastchester and Plaintiff had completed their bilateral settlement, and then assert them against Eastchester as third-party claims. The settlement process took approximately six months.

1

## BACKGROUND

### *The 1995 Mutual Aid Agreement*

Eastchester and Westchester were parties to a September 1995 agreement, entitled the "Westchester County Mutual Aid and Assistance Plan" (hereafter the "Agreement"), which is attached as Exhibit 'A' to Westchester's Third-Party Complaint (ECF No. 213.)  The Agreement was for a 10-year term, and expired July 30, 2005.  (*See* Agreement 3.)

The nature of the Agreement is straightforward, and is summarized in its first "whereas" clause: each municipality was to make its "police personnel and equipment available to the other[] when a condition existed which was beyond the scope of its police resources." (Agreement 1.)  Specifically, the Agreement states, in its fourth section, that:

> the Signatory Municipalities hereby agree to render appropriate police services to any Requesting Municipality whenever the Chief Executive Officer of that municipality deems the general public interest requires it. All such requests for assistance shall be made as hereinafter set for by the Chief Executive Officer or Department Head of the Requesting Municipality and granted by the Chief Executive Officer or Department Head of each Assisting Municipality.

(*Id.* at 3.)

The seventh section addresses the cost of police services provided under the Agreement. Subsection 7(c) therein addresses liability and defense.  It states, in its entirety, as follows:

> The Requesting Municipality shall reimburse the County and each Assisting Municipality for all liability for damages arising out of acts performed by the Assisting Municipality in rendering aid.  In addition, the Requesting Municipality ***shall provide defense for and defend, at its sole expense, any and all claims, demands or causes of action directly or indirectly resulting from the rendering of aid*** by the County and each Assisting Municipality.  Notwithstanding the foregoing, the Requesting Municipality shall not be liable for any damages resulting from any intentional wrongs or reckless conduct by the police force of the Assisting Municipality.

(*Id.* at 6 (emphasis added).)

### *The 1996 Eastchester Murders and Resulting Investigation*[2]

On November 21, 1996, the bodies of Betty Ramcharan and Archie Harris were discovered at Harris' home in Eastchester. The Eastchester Police Department immediately launched a homicide investigation. The next day, according to Eastchester police officer Mario Astarita, "[a]t 0900 hrs. Chief Speidell contacted the W.C.D.P.S. and requested assistance with this investigation in the form of man power." (3d Party Compl., Ex. D at 1.) This report was signed by Astarita (one of the individually-named Eastchester defendants), initialed by David Speidell, Chief of the Eastchester Police Department, and produced by Eastchester in discovery.

It is undisputed that the Westchester County Department of Public Safety ("WCDPS") honored Chief Speidell's request. As Astarita recorded, "[t]he following detectives from that agency reported to this department at 1000hrs., to assist with this investigation: Detectives Dennis Zack, [a]nd Detective John Doyle." (*Id.*) Louis D'Aliso, who was the WCDPS Commissioner from January 1996 until May 2003, fielded Chief Speidell's request "and approv[ed] the dispatch of several officers, including Detective John Doyle, to Eastchester in response[.]" (3d Party Compl., Ex. E at 1.) Records produced in discovery reflect that Doyle continued to assist Eastchester with its homicide investigation for months afterwards.

The 1996 Eastchester murders remained unsolved, however, and eventually the case went "cold." (Am. Compl. ¶ 59.) Then, on February 15, 2001, an anonymous tip to the Mount Vernon police department implicated Plaintiff in the murders. (East. Ans. 2.) Plaintiff was, at the time, in Mount Vernon's custody for violating a protective order issued on behalf of his ex-girlfriend, Cherlyn Mayhew. (*Id.* at 14.)

---

[2] The facts set forth herein are drawn from Plaintiff's Amended Complaint (ECF No. 52, hereafter "Am. Compl."), Eastchester's Amended Answer (ECF No. 93, hereafter "East. Ans."), and Westchester's Third-Party Complaint (ECF No. 213, hereafter "3d Party Compl.").

The Mount Vernon police relayed the anonymous tip about Plaintiff to their Eastchester counterparts. (East. Ans. 14.) The Eastchester police, in turn, "requested manpower assistance from WCDPS officers who were familiar with the double homicide investigation." (3d Party Compl., Ex. E at 2.) Commissioner D'Aliso again approved this request, dispatching Doyle and Calabrese, Doyle's supervisor, to assist the Eastchester police. (*Id.*)

It is undisputed that Doyle and Calabrese met Astarita and Matthew Kiernan, another Eastchester officer, at the Mount Vernon police department on the afternoon of February 15, 2001. According to their depositions, the two Eastchester officers then questioned Plaintiff for over five hours, while Doyle and Calabrese attempted to locate the anonymous tipster, who was believed to be Plaintiff's ex-girlfriend, Cherlyn Mayhew. They eventually located Mayhew outside her apartment building, and Mayhew agreed to speak with them at the Mount Vernon police station. She drove there with her boyfriend, Darnell Getter, and after speaking with the two WCDPS officers for several hours, made a signed, written statement implicating Plaintiff in the 1996 Eastchester murders.[3]

After walking Mayhew to the lobby, speaking briefly with Getter, and eating dinner, Calabrese and Doyle conferred with Kiernan and Astarita, who had finished their initial questioning of Plaintiff. Plaintiff had said nothing about the Eastchester homicides during that initial session. Sometime after midnight on what was now February 16, 2001, Kiernan and Astarita began a second questioning session with Plaintiff, which Calabrese and Doyle observed via a video monitor from a separate observation room. A third Eastchester officer, George Barletta, eventually arrived and joined the questioning. (East. Ans. 14.) Barletta knew

---

[3] Plaintiff claims (Am. Compl. ¶¶ 68-69) that Calabrese "pressured" Mayhew into making this statement, but fact discovery revealed no evidence of this alleged "pressure" and it is unclear whether, or in what form, this claim is still being asserted in the underlying action. Eastchester and Westchester attempted to depose Mayhew, but she was excused from complying with her subpoena for medical reasons.

Plaintiff's mother, Stella Days, and had arrested Archie Harris for sexual misconduct against Stella Days several months before Harris was murdered. (*Id.*)  After Barletta joined the questioning, Plaintiff confessed to murdering Archie Harris and Betty Ramcharan. (*Id.* at 18.)

Plaintiff alleges, in the underlying action, that his confession was false, and that the three named Eastchester officers coerced him into making it.  He does not allege that either Calabrese or Doyle, the other WCDPS officer, coerced him.  Instead, Plaintiff's theory of liability as to Westchester is that Calabrese "conspired" with the Eastchester officers to not record his questioning until Days "was ready to make a confession on video that could seem plausible."[4] (Am. Compl. ¶¶ 76, 137.)  Eastchester categorically denied this allegation (*see* East. Ans. 17, 28), as well as the allegation that its officers threatened or otherwise coerced Plaintiff into confessing.  (*Compare* Am. Compl. ¶¶ 79-80, 136 *with* East. Ans. 17-18, 28.)

## LEGAL STANDARDS

Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 permit parties to obtain declaratory judgments to determine their rights and obligations in cases involving actual controversies.  Declaratory judgments are a long-standing method of adjudicating contractual rights, including in third-party actions. *See, e.g.*, *Port Clyde Foods, Inc. v. Holiday Syrups, Inc.*, 563 F. Supp. 893, 895 (S.D.N.Y. 1982).

Regarding the 1995 Agreement, "[t]he cardinal principle for the construction and interpretation of . . . contracts . . . is that the intention of the parties should control." *Beth Medrash Eeyun Hatalmud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2008) (internal quotation marks omitted; alteration in original).  "[T]he best evidence of intent is the contract itself; if an

---

[4] Doyle is not named as a defendant to the underlying action.

5

agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Id.* (internal quotation marks omitted).

"A contract is unambiguous where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted). "[T]he mere fact that [p]arties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 329 (S.D.N.Y. 2010) (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

## ARGUMENT

**I.     Eastchester is contractually obligated by the 1995 Agreement to defend the Third-Party Plaintiffs in the underlying action.**

Westchester formally demanded defense from Eastchester on August 23, 2021. (3d Party Compl. ¶ 63.) Eastchester rejected this demand on September 8, 2021. (*Id.* at ¶ 65.) But the Agreement's clear and unambiguous terms obligate Eastchester to defend Westchester and Calabrese in the underlying action. The Agreement contains an explicit, mandatory, and broad provision that Eastchester "***shall*** provide defense for and defend, at its sole expense, ***any and all*** claims, demands or causes of action directly or indirectly resulting from the rendering of aid by the County." (Agreement 6 (emphases added).) It is uncontroverted that Westchester rendered aid, at Eastchester's request, to assist with Eastchester's homicide investigation, and uncontroverted that Plaintiff's underlying claims against Westchester and Calabrese directly resulted from the rendering of said aid, notwithstanding the fact that those claims were filed more than 17 years after the events in question.

## II. Eastchester's proffered reasons for refusing to honor the Agreement lack merit.

In refusing to honor its obligation to defend the Third-Party Plaintiffs, Eastchester did not deny that the 1995 Agreement constitutes a valid and binding contract, or that it was in effect at all relevant times. Nor did Eastchester contend that Westchester failed to fulfill its own obligations, or that any other condition precedent was not met. Instead, Eastchester offered three reasons for its refusal, none of which has merit. (*See generally* 3d Party Compl., Ex. C.)

### A. Laches

First, Eastchester asserted that the County's "delay in asserting this claim has caused significant prejudice to the Town's ability to defend itself and the County," and "[c]onsequently, this claim is barred by laches." (*Id.* at 1.) Laches "requires a showing by the defendant that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019).

The delay here was not "unreasonable." As set forth in its third-party complaint, Westchester did not have a copy of the Agreement upon which its contractual defense claim is based until June 8, 2021, when it obtained a copy of the 25-year-old Agreement from Eastchester's law department. (*See* June 8, 2021 e-mail chain (3d Party Compl., Ex. B).) It is unclear why, if Eastchester was in possession of the Agreement, it was not produced earlier in this litigation—specifically, in response to Plaintiff's Document Request No. 37, dated April 15, 2019, which required production of "[a]ll documents … concerning any agreement to either indemnify or defend the Individual Defendants in this action." Had Eastchester timely produced the Agreement in response to this Document Request, Westchester could have asserted its contractual defense claim years earlier. Any delay is therefore attributable to Eastchester itself.

Regarding the prejudice prong of the laches analysis, *see Zuckerman*, 928 F.3d at 193, Eastchester asserted that "[q]uestions put to witnesses by County attorneys have elicited testimony that was not only favorable to plaintiff, but was also extremely prejudicial to the Town." (3d Party Compl., Ex. C at 2.)  It is unclear which testimony Eastchester is referring to, and Eastchester did not suggest that the elicited testimony was untrue or incomplete.  Moreover, there is no basis to conclude that separate conflict counsel for Westchester, retained earlier in this case by Eastchester, would have elicited testimony any different than the testimony about which Eastchester now complains.

Eastchester also asserted prejudice due to the fact that Westchester "has not designated any experts [on the issue of coercive interrogation] in this case, and the time to designate such experts has long expired." (*Id.*)  But expert discovery in the underlying action has not even commenced, having been stayed pending mediation and settlement negotiations.  Moreover, neither Calabrese nor Doyle participated in Plaintiff's questioning, so Westchester's liability does not turn on any expert opinion as to whether this questioning was coercive.  To the extent an expert on "coercive interrogation" does ultimately prove necessary, Eastchester itself timely designated such an expert while still a party to the underlying action; this expert's opinion may be used in Westchester's defense if the case proceeds to expert discovery.

Lastly, Eastchester asserted prejudice on the ground that Westchester's "belated tender has deprived the Town of a fair and reasonable opportunity to defend this case[.]"  (*Id.*)  But Westchester has vigorously defended ***itself*** in the underlying case; it is unclear what Eastchester would or could have done differently on Westchester's behalf.  If anything, Westchester's

"belated tender" [5] *helped* Eastchester, as the two municipalities fully cooperated in their mutual defense, splitting discovery, research and briefing tasks from the outset.

### B. "Intentional Wrongs or Reckless Conduct"

Eastchester's second stated reason (*see* 3d Party Compl., Ex. C at 3) for refusing to honor the Agreement is the sentence in Subsection 7(c) that reads, "Notwithstanding the foregoing, the Requesting Municipality shall not be liable for any damages resulting from any intentional wrongs or reckless conduct by the police force of the Assisting Municipality." Because Plaintiff's only remaining claims against Westchester and Calabrese are for "intentional wrongs or reckless conduct," Eastchester reasons, it is relieved of its defense obligation.[6]

Eastchester conflates its defense and indemnification obligations. By the Agreement's clear language, only the *latter* turns on whether there were "intentional wrongs or reckless conduct by the police force of the Assisting Municipality." (Agreement 6.) The preceding sentence, which sets forth the duty to "provide defense for and defend" Westchester, contains no such condition. (*See id.*) Defense and indemnification obligations are typically differentiated in just this way, because a duty to defend would be rendered meaningless if it could not even be triggered until the end of a lawsuit. *See Hotel Des Artistes v. Transamerica Ins. Co.*, No. 93-CV-4563 (SS), 1994 U.S. Dist. LEXIS 7800, at *10 (S.D.N.Y. June 10, 1994) ("the duty to defend does not turn on the merits of the underlying lawsuit or the action's ultimate success").[7]

---

[5] It is worth noting that the Agreement does not require a formal "tender" to trigger the defense obligations of the municipality receiving aid. Nothing, in fact, prevented Eastchester from affirmatively assuming the entire defense at the outset of the underlying action (or at least raising this issue).

[6] It is not clear, at this juncture, which of Plaintiff's remaining claims actually allege "intentional wrongs or reckless conduct," but the instant motion may be decided without resolving this.

[7] To be clear, Westchester's separate claim for contractual *indemnification* does turn on whether there is ultimately a finding of "intentional wrongs or reckless conduct"—which is why that claim, unlike the contractual *defense* claim at bar, is not ripe for adjudication.

9

### C. Section 209-m of New York's General Municipal Law

Eastchester's third stated reason for refusing to honor the Agreement is its assertion that "N.Y. Gen. Municipal Law § 209-m, by its terms, simply does not apply to the instant facts and circumstances. … [S]ince § 209-m does not apply, then the [1995 Agreement], which was entered into pursuant to said statute, is also inapplicable." (3d Party Compl., Ex. C at 5.)

Westchester disagrees with this characterization of 209-m and its applicability here, but regardless, the issue at bar is Eastchester's contractual obligation to **defend** the Third-Party Plaintiffs. Section 209-m, in contrast, concerns its obligation to ultimately **indemnify** Third-Party Plaintiffs. *See* N.Y. GEN. MUN. LAW § 209-m(5) ("The local government receiving police aid pursuant to this section shall assume the liability for all damages arising out of any act performed in rendering such aid"). It is therefore not relevant to the instant motion.[8] And even assuming, *arguendo*, that it was, nothing in that statute prohibits municipalities from agreeing to additional, defense obligations. *See id.*

Indeed, "absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish." *Int'l Techs. Mktg. v. Verint Sys.*, 157 F. Supp. 3d 352, 364-65 (S.D.N.Y. 2016) (citations omitted). Here, the parties to the Agreement specifically included Subsection 7(c)'s clearly-worded provision obligating the municipality receiving aid to defend the municipality providing it against any future lawsuits. (*See* Agreement 6.) The Court should decline Eastchester's invitation to simply read this provision out of existence. *See Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183 (2d Cir. 2019) (agreements must be interpreted so as to give "a reasonable, lawful, and effective meaning to all the terms").

---

[8] Section 209-m does form the basis of Westchester's separate claim for statutory indemnification, but the instant motion does not require adjudication of that claim.

10

## **CONCLUSION**

The contractual clause obligating Eastchester to defend Westchester and Calabrese in the underlying action is clear, unambiguous, mandatory, and broad: "the Requesting Municipality shall provide defense for and defend, at its sole expense, any and all claims, demands or causes of action directly or indirectly resulting from the rendering of aid by the County[.]" (Agreement 6.) Westchester honored the Agreement—without hesitation—in November 1996 and February 2001; Eastchester should not be excused from now doing the same.

For this, and the other reasons set forth above, Westchester and Calabrese respectfully request that the instant motion be GRANTED, and that this Honorable Court issue a judgment declaring that Eastchester is contractually obligated to defend them in the underlying action.

Dated: White Plains, New York
      March 1, 2022

JOHN M. NONNA,
WESTCHESTER COUNTY ATTORNEY
148 Martine Avenue, Suite 600
White Plains, New York 10601
*Counsel for Westchester and Christopher Calabrese*

by:

/s/ *David H. Chen*
David H. Chen, Esq.
dhca@westchestergov.com
(914) 995-3616

/s/ *Shawna C. MacLeod*
Shawna C. MacLeod, Esq.
scma@westchestergov.com
(914) 995-4194

/s/ *Jordan Silver*
Jordan Silver, Esq.
jlse@westchestergov.com
(914) 995-2115