UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SELWYN DAYS,

                            Plaintiff,

     -against-

THE COUNTY OF WESTCHESTER and
CHRISTOPHER CALABRESE,

                            Defendants.

THE COUNTY OF WESTCHESTER and
CHRISTOPHER CALABRESE,

                       Third-Party Plaintiffs,

     -against-

THE TOWN OF EASTCHESTER

                       Third-Party Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/04/2024

18-CV-11538 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

     The County of Westchester ("the County") and Westchester police officer Christopher Calabrese ("Calabrese") (collectively, "Westchester" or the "Third-Party Plaintiffs") move the Court for a summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") seeking judgment that the Town of Eastchester ("Eastchester" or "Third-Party Defendant") is contractually obligated to defend the Third-Party Plaintiffs against Plaintiff Selwyn Days' ("Plaintiff") remaining claims in the underlying action, which Plaintiff brought pursuant to 42 U.S.C. § 1983. (ECF No. 246.) Eastchester cross-moves pursuant to Rule 56 for a summary judgment dismissing Westchester's Third-Party Complaint its entirety. (ECF No. 251.)  For the following reasons, the

Court denies Third-Party Plaintiffs' motion for summary judgment and grants in part and denies in part Third-Party Defendant's motion for summary judgment.

## BACKGROUND

### I.   Procedural Background

Plaintiff Selwyn Days ("Plaintiff" or "Days") commenced the underlying action pursuant to 42 U.S.C. § 1983 against the Eastchester Police Department, Town of Eastchester, Mario Astarita, George Barletta, and Matthew Kiernan (together, the "Eastchester Defendants") and the County of Westchester and Christopher Calabrese (together, the "Westchester Defendants") (collectively, the "Defendants") on December 11, 2018. (*See* Complaint, ECF No. 1.) In this action, Plaintiff sought redress for alleged civil rights violations stemming from his 2004 and 2011 convictions for two counts of murder.   (*See* First Amended Complaint ("FAC") ECF No. 52.) Plaintiff was acquitted by a jury after his fifth trial in 2017, serving 16 years and 7 months in jail before he was released, and thereby alleged the violation of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under state law. (*Id.*)

The Court granted in part and denied in part the Westchester Defendants' Motion to Dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), (ECF No. 65), and denied the Eastchester Defendants' Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 103). (*See* ECF No. 122.) Specifically, Plaintiff's § 1983 claim against Defendant County of Westchester and claim for punitive damages against Defendant County of Westchester were dismissed with prejudice, and all other claims remained.

By stipulation dated February 8, 2022 (the "Stipulation") (ECF No. 210), Plaintiff agreed to dismiss all claims against the Eastchester Defendants, as well as all claims against the Westchester Defendants, except for those claims predicated upon "intentional wrongs or reckless conduct." (*See* ECF No. 210, at 2.) On February 15, 2022, and pursuant to this Stipulation, the Westchester Defendants filed a third-party complaint (the "Third-Party Complaint") against Eastchester, asserting claims for declaratory relief, breach of contract, contractual and statutory indemnification, and contribution. (*See* ECF No. 213.)

Subsequently, on July 29, 2022, Third-Party Plaintiffs filed a motion for declaratory judgment (the "Motion") seeking a judgment declaring that Eastchester is obligated, based on a 1995 inter-municipal agreement (the "Agreement"), to defend the Third-Party Plaintiffs against Plaintiff's remaining claims at Third-Party Defendant's sole expense. (*See* ECF. No. 236.) As established in the Stipulation, such a declaration would be dispositive of the entire case, given that Plaintiff and Third-Party Plaintiffs have agreed to dismiss all their remaining claims in that eventuality. (*See* ECF No. 210, at 2.) Third-Party Defendant filed a cross-motion for declaratory judgment (the "Cross-Motion") seeking to dismiss Third-Party Plaintiffs' Third-Party Complaint (*See* ECF No. 240.) On March 13, 2023, the Court construed the motions as motions for summary judgment and dismissed them without prejudice and with leave to renew in accordance with this District's Local Rules and this Court's Individual Rules of Practice in Civil Case. (ECF No. 245.)

In accordance with that Opinion, the parties properly filed their respective motions for summary judgment. Both motions were fully briefed as of April 11, 2023: Third-Party Plaintiffs' Motion for Summary Judgment on Count One of the Third-Party Complaint (ECF No. 246); Third-Party Plaintiffs' Memorandum of Law in Support ("Westchester Mem.," ECF No. 247); Third-Party Plaintiffs' Rule 56.1 Statement of Material Facts ("Westchester 56.1," ECF No. 250); Third-

Party Plaintiffs' Reply Memorandum ("Westchester Reply") (ECF No. 248); Third-Party Defendant's Cross-Motion for Summary Judgment (ECF No. 251); Third-Party Defendant's Memorandum of Law in Support ("Eastchester Mem.," ECF No. 253); Third-Party Defendant's Rule 56.1 Statement of Material Facts ("Eastchester 56.1," ECF No. 255); Third-Party Defendant's Counterstatement to Westchester's Rule 56.1 Statement ("Eastchester 56.1 Resp.," ECF No. 256); and Third-Party Defendant's Reply Memorandum ("Eastchester Reply," ECF No. 254).

## II.   Factual Background

The following facts are derived from the record and the parties' Rule 56.1 statements.[1] They are not in dispute unless otherwise noted.[2]

### A.   The 1996 Double Homicide in the Town of Eastchester

On November 21, 1996, the bodies of Archie Harris and Betty Ramcharan, Harris' home health aide, were discovered at Harris' home in the Town of Eastchester, New York. (Westchester 56.1 ¶¶ 9, 11.) Officers of the Eastchester Police Department ("EPD") went to the scene, then the "better equipped" Westchester County Crime Scene Unit subsequently arrived to assist Eastchester with the investigation. (*Id.* ¶ 10.) According to a report written by Eastchester Detective/Sergeant Mario Astarita, the following morning at 9:00 a.m. then-Chief of EPD David Spiedell ("Chief Spiedell") contacted the Westchester County Department of Public Safety ("WCDPS") to request "assistance with [the] investigation in the form of man power." (*Id.* ¶ 12.) At the time Chief

---

[1] Citations to "Westchester Ex." refer to the Exhibits attached to the Declaration of David H. Chen in Support of Third-Party Plaintiffs' Motion for Summary Judgment. (ECF No. 249.) Citations to "Eastchester Ex." refer to the Exhibits attached to the Declaration of Peter Riggs in Support of Third-Party Defendant's Cross-Motion for Summary Judgment. (ECF No. 252.)

Where applicable, the Court uses Bates number of the documents as provided by the parties.

[2] The Court notes that Eastchester's responses to all the statements within Westchester's Rule 56.1 Statement are "controverted." (*See* Eastchester's Response.) Westchester did not file a response to Eastchester's Rule 56.1 Statement.

Spiedell made this request, the identity and location of the person or persons responsible for the Eastchester murders was unknown to any law enforcement agency. (*Id.* ¶ 13.) Then-head of WCDPS Commissioner Louis S. D'Aliso ("Commissioner D'Aliso") approved Chief Spiedell's request and dispatched several officers, including Detective John Doyle, to assist Eastchester with the murder investigation. (*Id.* ¶ 14.) The 1996 Eastchester double homicide investigation was just one of five homicide investigations that took place in Eastchester from 1983 to 2021 and would remain unsolved until February 2001. (*Id.* ¶¶ 15-16.)

On February 15, 2001, a Mount Vernon, New York police officer informed the Eastchester police that they had in custody a person named Selwyn Days (Plaintiff) and that someone said he may be responsible for the Eastchester murders. (*Id.* ¶ 17.) Eastchester police officers Astarita and Matthew Kiernan, the lead officer on the case, went to Mount Vernon to question Plaintiff. (*Id.* ¶¶ 17, 19.) EPD requested assistance from WCDPS officers familiar with the double homicide investigation and in response Commissioner D'Aliso again approved the dispatch of Detective Doyle and then-Lieutenant Christopher Calabrese to EPD. (*Id.* ¶ 18.) On February 15, 2001, at the request of Officer Kiernan, the officers met at the Mount Vernon Police Department, where Plaintiff was being held. (*Id.* ¶ 19.) While Kiernan and Astarita questioned Plaintiff, Doyle and Calabrese attempted to locate the person who had implicated Plaintiff in the murders, later confirmed to be Plaintiff's ex-girlfriend, Cherlyn Mayhew. (*Id.* ¶¶ 20, 22-23.) Upon locating Mayhew, Calabrese and Doyle took her to the Mount Vernon Police Department for question, where she stated that Plaintiff had told her he killed two people in Eastchester. (*Id.* ¶¶ 22-23.) Calabrese later testified that Mayhew was "a reliable source information," and that he never had any contact with Plaintiff. (*Id.* ¶ 24, 27.)

Keirnan and Astarita questioned Plaintiff twice. Their initial questioning of Plaintiff lasted approximately five hours. (*Id.* ¶ 21.) After confirming Mayhew had implicated Plaintiff in the 1996 double homicide, Kiernan and Astarita questioned Plaintiff for a second time, later being joined by Eastchester police officer George Barletta, who had investigated the July 1996 sexual assault of Plaintiff's mother by Harris. (*Id.* ¶¶ 26, 28-29.) Sometime after Barletta joined the questioning, Plaintiff confessed to murdering both Harris and Ramcharan. (*Id.* ¶¶ 31-32.) None of the first, lengthier questioning by Astarita and Kiernan, and only the latter part of the second, shorter questioning session by Astarita, Kiernan, and Barletta was recorded (*Id.* ¶ 33.) At the time, it was not standard practice for EPD or WCDPS to record their interrogations and neither local, state, or federal law, required such questioning be recorded. (*Id.* ¶ 34.) Once Plaintiff began discussing the murders, Calabrese took contemporaneous notes of the Eastchester officers' ongoing questioning, testifying later that he and Doyle "screwed up" by not being read to start videotaping "from the very beginning." (*Id.* ¶ 36.)

A grand jury convened by the Office of the Westchester District Attorney indicted Plaintiff for the murders. (*Id.* ¶ 40.) At a pretrial hearing, the trial court denied Plaintiff's motion to suppress the video recording and ruled Plaintiff's confession was voluntary and admissible. (*Id.*) The video was admitted into evidence at his five subsequent murder trials, and each resulted in, respectively: a hung jury; a conviction that was later overturned based on ineffective assistance of counsel; another hung jury; a conviction that was later overturned on the ground that the court had erroneously refused to allow expert testimony on false confessions; and an acquittal. (*Id.*)

**B. Plaintiff's Underlying Civil Action**

On December 11, 2018, Plaintiff brought the underlying lawsuit against the Eastchester Defendants, alleging that he was wrongly convicted and confessed to the murders because the

individually-named Eastchester Defendants, the police officers who conducted the interrogation leading to this confession, coerced him in February 2001. (*Id.* ¶ 41.) The Eastchester Defendants categorically deny Plaintiff's allegations, and Calabrese testified that he never saw any of the Eastchester officers do anything that violated Plaintiff's civil rights. (*Id.* ¶ 44.) The failure by the two WCDPS officers to record the entirety of Plaintiff's second round of questioning by the Eastchester police officers is the basis for the alleged liability asserted by Plaintiff against Westchester in the underlying suit. (*Id.* ¶ 37.)

On February 11, 2022, Plaintiff, the Eastchester Defendants, and the Westchester Defendants executed a stipulation (the "Stipulation"), which resulted in: (1) Eastchester settling with Plaintiff in exchange for dismissal of all claims against the Eastchester Defendants; (2) Plaintiff dismissing all his underlying claims against the Westchester Defendants "except for those predicated on intentional wrongs or reckless conduct"; and (3) Westchester filing a third-party complaint against Eastchester. (*Id.* ¶ 48; *see* ECF No. 210.) Westchester's Third-Party Complaint asserted causes of action for declaratory relief, breach of contract, contractual and statutory indemnification, and contribution. (*See* ECF No. 213.)

### C.  The Mutual Aid Agreement and Demand for Defense and Indemnification

On May 15, 1989, the Westchester County Board of Legislators enacted a local law (the "1989 Local Law") authorizing the County "to establish a Police Mutual Aid and Assistance Plan for the benefit of participating municipalities within the County of Westchester to carry out the purposes described in Section 209-m of the New York General Municipal Law." (*Id.* ¶ 1.) This local law stated that the "Police Mutual Aid Plan is to be effectuated by inter-municipal cooperation agreements between the County and the municipalities within the County of

Westchester whereby the Chief Executive Officer or Chief of Police of a participating municipality may request or grant police assistance." (Westchester 56.1 ¶ 2; Eastchester 56.1 ¶ 3.)

On September 7, 1995, pursuant to the 1989 Local Law, Westchester entered into a written agreement (the "Agreement") with the Town of Eastchester regarding mutual aid between the two municipalities' respective police departments. (Westchester 56.1 ¶ 3.) The Agreement was signed by the then-County Executive on behalf of Westchester, approved by the Westchester County Board of Legislatures on March 27, 1995, and approved by the Board of Acquisition and Contract of the County of Westchester on May 18, 1995. (*Id.* ¶ 5.) On behalf of Eastchester, the Agreement was signed by the then-Town Supervisor, James Cavanaugh. (*Id.* ¶ 6, 7.) The Eastchester Town Clerk also signed a Certificate of Authority stating that the Agreement was signed on behalf of the Municipality and authorized by the Town Board. (*Id.* ¶ 8.) Both the signature of the Town Supervisor and the Eastchester Town Clerk were notarized. (*Id.* ¶¶ 7-8.) The Agreement carried a ten-year term, covering the entirety of the investigation into the 1996 double homicide. (*Id.* ¶ 4.)

On June 8, 2021, in response to a request made by Westchester's Commissioner of Finance, Karen Barletta of the Town of Eastchester Law Department forwarded a copy of the Agreement to Dawn Donovan, the Eastchester Town Comptroller, who in turn forwarded it to the County. (*Id.* ¶ 45.) On August 23, 2021, Westchester made a written demand to Eastchester for defense and indemnification against Plaintiff's underlying civil action, pursuant to the Agreement and Section 209-m of New York's General Municipal Law. (*Id.* ¶ 46.) On September 8, 2021, Eastchester rejected this demand. (*Id.* ¶ 47.)

Per the Stipulation, summary judgment in favor of Westchester on its first cause of action for declaratory relief would dispose of the entire case, given that Plaintiff and Westchester agreed to dismiss all their remaining claims in that eventuality. (*Id.* ¶ 50.)

**LEGAL STANDARDS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v.*

*Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

Westchester seeks summary judgment on Count One of the Third-Party Complaint against Eastchester for declaratory relief. Specifically, Westchester seeks a declaration pursuant to 28 U.S.C. Section 2201(a) that Eastchester is contractually obligated under the 1995 Agreement to "provide defense for and defend" Westchester against Plaintiff's remaining claims in the underlying action. The remaining claims against Eastchester are those predicated upon "intentional wrongs or reckless conduct."[3] Eastchester cross-moves for summary judgment seeking to dismiss Westchester's Third-Party Complaint in its entirety.[4]

---

[3] While Westchester initially sought to assert these claims as cross-claims, at the request of the assigned Magistrate Judge Andrew E. Krause, Westchester withheld these claims until the resolution of the bi-lateral agreement between Plaintiff and Eastchester, and then asserted them as third-party claims instead. (ECF No. 206.)

[4] The parties, particularly Eastchester, spend a number of words in their briefs on the issue of how the Agreement came to be exchanged during discovery, the use of experts in defending against the underlying action, and the timing of Westchester's assertion of its claims for defense and indemnification. None of

**A. Westchester's Motion for Summary Judgment**

Westchester argues Eastchester is bound to "provide defense for and defend" against the claims pursuant to the 1995 Agreement, an inter-municipal agreement whereby signatories agreed to render police services to requesting municipalities when the public interest so requires. The Agreement reads, in pertinent part:

> The Requesting Municipality shall reimburse the County and each Assisting Municipality for all liability for damages arising out of acts performed by the Assisting Municipality in rendering aid. In addition, *the Requesting Municipality shall provide defense for and defend, at its sole expense, any and all claims, demands or causes of action directly or indirectly resulting from the rendering of aid by the County and each Assisting Municipality.* Notwithstanding the foregoing, the Requesting Municipality shall not be liable for any damages resulting from any intentional wrongs or reckless conduct by the police force of the Assisting Municipality.

(Westchester Ex. 2 at 15 (emphasis added).) Westchester maintains that this Agreement is not only duly executed, but also legally valid pursuant to the 1989 Local Law, which provided statutory authorization for the establishment of a Westchester Police Mutual Aid and Assistance Plan (the "Plan" or "Mutual Aid Plan"). (Westchester Ex. 1 at 1.) The Mutual Aid Plan was to be effectuated by intermunicipal cooperation agreements between the County and the municipalities (in this case, the Agreement), and those agreements allowed a participating municipality's Chief Executive Office or Chief of Police to request or grant police assistance. (*Id.*) Pursuant to that statutory authorization, the Agreement provided that "[a]ll such requests for assistance shall be made hereinafter set for by the Chief Executive Police Officer *or the Department Head of the Requesting Municipality* and granted by the Chief Executive Officer *or Department Head of each Assisting Municipality*." (Westchester Ex. 2 at 13.)

---

these issues are material to the resolving the parties' substantive arguments on the instant motions, and the Court does not consider them here.

Westchester continues that it is undisputed that (1) "Westchester rendered aid—at Eastchester's request—to Eastchester's double homicide investigation in February 2001, when the 1995 Agreement was in effect"; (2) Eastchester's requested was made by the "Department Head of the Requesting Municipality," EPD Chief Spiedell, and granted by the "Department Head of [the] Assisting Municipality," WDPS Commissioner D'Aliso; and (3) "[Plaintiff's] remaining, underlying claims against Westchester stem entirely from this rendering of said aid to Eastchester." (Westchester Mem. at 4.) Taken together, Westchester argues that given that the clear and unambiguous terms of the Agreement require Eastchester to defend Westchester against Plaintiff's underlying claims and all conditions precedent were met, the Court should grant Westchester's motion. (*Id.*)

Eastchester, for its part, argues it is not quite that simple. In Eastchester's view, the Agreement does not govern, and therefore the Court should not only deny Westchester's motion but also dismiss Westchester's Third-Party Complaint in its entirety. Specifically, Eastchester argues the Agreement is inapplicable here because (1) the aid provided by Westchester as part of a multi-year homicide investigation is not the "emergency" intended to be covered by the Agreement; (2) neither Chief Spiedell or Commissioner D'Aliso were authorized to request or grant assistance pursuant to General Municipal Law ("GML") § 209-m; and (3) there is no statutory authority for imposing a duty to defend on municipalities in intermunicipal agreements.

Eastchester argues it is undisputed that the Agreement is derived from the Mutual Aid Plan and its statutory authority derives from Section 209-m, both of which the signatories annexed to the Agreement as part of Schedule A. (Eastchester Mem. at 5.) Reading the Agreement alongside the Mutual Aid Plan and Section 209-m, Eastchester argues that the Agreement was only ever intended to apply to "emergencies of 'extreme serious proportions' as it expressly states, and once

invoked, called for the specific responses set forth therein." (Eastchester Mem. at 9.) Eastchester asserts that the "routine intermunicipal assistance" Westchester provided to Eastchester in February 2001—which consisted of "forensic services to investigate the crime scene, and then provided manpower assistance in the form of a few detectives sporadically assisting the Town's police force with the investigation over a five-year period"—does not suffice to invoke the Agreement. (*Id.* at 9.)

> 1.    *Principles of Contract Interpretation*

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "The matter of whether the contract is ambiguous is a question of law for the court." *Id.* (citing *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 868 N.E.2d 956, 959, 837 N.Y.S.2d 600 (N.Y. 2007)). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 466 (citing *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76, 83 (2d Cir.2002)) (internal quotation marks omitted). A court should not find the contract ambiguous where the interpretation urged by one party would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

Where the parties dispute the meaning of particular contract clauses, the task of the court "is to determine whether such clauses are ambiguous when read in the context of the entire agreement." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d

Cir.1993) (internal quotation marks omitted). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 236 (2d Cir.2008). "If the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court." *Caring Habits, Inc. v. Fund for the Pub. Int., Inc.*, No. 11-CV-5768 NSR LMS, 2014 WL 7146041 (S.D.N.Y. Dec. 13, 2014) (citation omitted). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.2000)).

        2.  *Application*

        Here, the Court finds the language of the Agreement unambiguous. The Agreement[5] cannot plausibly be read to apply to "routine police assistance," such as the dispatching of a couple of detectives for an interrogation in a cold case. Rather, the Agreement was clearly meant be invoked in limited emergency situations requiring a coordinated, intermunicipal response or for granting or requesting specialized, emergency services of signatory municipalities. Upon due consideration of the terms and conditions of the Agreement, the Court finds that WCDPS dispatching a couple officers to Eastchester for an interrogation cannot plausibly fall within the scope of the Agreement.

---

[5] All terms used throughout this subsection carries the same meaning as they are defined in the Agreement. (*See* Westchester Ex. 2 at 10-12.)

> a. *The Aid Westchester Provided Eastchester Does Not Constitute*
> *"Mutual Aid" under the Agreement*

Before analyzing the provisions of the Agreement that supports its conclusion, the Court first considers the Mutual Aid Plan incorporated therein. The plain language of the Mutual Aid Plan executed by Westchester, Eastchester, and other Signatory Municipalities, attached as part of Schedule A to the Agreement, expressly conveys the limited situations for invoking the Plan. The Plan explicitly states it is "to be used solely for emergencies," and provides that "[u]pon transmission of the Mutual Aid Alert, *all departments in the County* should be prepared in the event that additional manpower may be needed for a neighboring zone." (Westchester Ex. 2 at 21.) Appendix A-2 is a map of the five mutual aid police zones covering the County. (*Id.* at 23.) The Plan further outlines five phases of alerts for an "affected department" to utilize in calling for assistance. (*Id.*) At Phase 1, a situation "of extreme serious proportions" exists, and departments within the affected departments' zone should prepare themselves, while at Phase 5 "maximum assistance [is] required from all departments in the County." (*Id.* at 21.) Phases 1 and 2 reference the "prearranged manpower and equipment" departments within the same zone are requested to provide, and Phase 3 through 5 outline the stages for dispatching manpower and assistance from municipalities within the same zone of occurrence, those outside the zone, and ultimately, those from all departments in the County. (*Id.* at 21.) "[U]ltimate success of this Mutual Aid and Assistance Plan," the Plan states in Appendix A-1, "will depend upon the cooperation of every department in the proper and judicious use of the aforementioned steps and procedures." (*Id.* at 22.)

Considered in its entirety, the Mutual Aid Plan sets forth a clear scheme for invoking a concentrated, coordinated police response from multiple municipalities in emergency situations. Other hints within the Agreement bolster this conclusion. The Plan provides top priority to "civil

disturbances and situations presenting a threat to human life." (*Id.* at 21.) It includes a provision on setting up a "command post." (*Id.*) Even Section 209-m, the statutory basis for the Agreement—is titled, in part, "civil disturbance control." GML § 209-m. The Court envisions a municipality invoking the Mutual Aid Plan when there is an emergency situation civil disobedience, such as riots or large civic demonstrations. Not when a municipality needs a few police resources to continue the investigation of a five-year old homicide case.

The Agreement ratified the Mutual Aid Plan between Eastchester, referred to in the Agreement as a "Signatory Municipality," and the County of Westchester, referred to as the "County," incorporating it as Schedule A. (Westchester Ex. 2 at 12.) Paragraph Fourth details the agreement among the municipalities to render assistance in the form of police services, as well as the limitations on that assistance. Specifically, Paragraph Fourth(c) states: "A Requesting Municipality shall request police services from all municipalities within its mutual assistance zone which shall include a response from the Westchester County Department of Public Safety" as set forth the Mutual Aid Pla*n*. (*Id.* at 13.) The Agreement further provides that the services "shall be rendered on *a* mandatory basis," as indicated in the Mutual Aid Plan. (*Id.*) As discussed above, the Mutual Aid Plan identifies mutual aid zones for the municipalities and details the logistics for a Requesting Municipality to seek assistance from municipalities both within each zone as and outside each zone. The Agreement incorporates that same scheme. It is therefore clear that the Agreement was intended to apply to the same limited, emergency circumstances as the Mutual Aid Plan, rather than to "routine assistance" provided from the County to a single municipality.

While the Mutual Aid Plan, as incorporated into the Agreement, is compelling evidence of the limited, emergency situations in which the Agreement and Plan should be invoked, the provisions of the Agreement itself also supports the Court's conclusion. At the outset, Paragraph

Eighth specifies that "before any request is made," the Requesting Municipality must certify that there is an "emergency condition . . . beyond the scope of the municipality's police resources." (*Id.* at 15.) Moreover, as Eastchester notes, there is a theme of mandated, collective response throughout the Agreement. (*See* Eastchester Mem. at 7.) As noted above, Paragraph Fourth(c) contemplates a response from "all municipalities" and Paragraph Fifth(a) dictates that the Assisting Municipality shall render such services "on a mandatory basis." (*Id.* at 12-13.) Furthermore, the reimbursement, legal defense, and indemnifications provisions specify these obligations apply to "the County *and each Assisting Municipality*," which lends further credence to Eastchester's argument that the situations the Agreement was intended to apply to are those requiring a coordinated response from multiple municipalities. (*Id.* at 15.) Notably, Westchester otherwise fails to address this part of Eastchester's arguments, and continuously cites to Paragraph Seventh while dropping "and each assisting Municipality." (*See* Westchester Reply at 2-3, 6.)

Further agreeing with Eastchester, the Court also notes that the provision dictating that the Assisting Municipality shall be under the control and direction of the department of the Requesting Municipality for the duration of their duty" lends further support to the conclusion that the rendering of aid between municipalities was meant for temporary, emergency bases. (*Id.*¶ Sixth.) Notably, Westchester fails to address this argument in their Reply as well.

For its part, Westchester argues that the 1996 double homicide investigation, Eastchester Police Department's first homicide investigation in the past forty years, certainly constitutes an "extreme serious situation" or "emergency," which the dictionary and thus the Agreement defined as a "urgent need for assistance or relief." (Westchester Reply at 2-3; Agreement ¶ First (4) ("Emergency shall have its common dictionary definition.").) Given Eastchester's lack of manpower and requiring additional detectives from WCDPS and assistance from the WCDPS

17

Forensic Investigation Unit, Westchester argues, 1996 homicide investigation was an emergency and "as 'serious' as it gets." (*Id.*) The 1996 double homicide and its investigation, one of four in forty years, was undoubtedly "serious." However, given that the investigation had run cold between the start of the investigation in 1996 and the dispatch of WCDPS officers Calabrese and Doyle and Plaintiff's interrogation in February 2001, the aid provided by the County does not constitute an "emergency" as contemplated by the Agreement. Eastchester raises a good point—it stretches the meaning of the term if an unsolved murder with an at-large, unidentified murderer constitutes an "emergency" for five years and continuing to today.

Moreover, Westchester argues the Agreement does not qualify "rendering of aid" of Paragraph Seventh(c) and therefore does not distinguish between "routine" and "emergency" assistance (*Id.* at 3 (citing Agreement ¶ Seventh(c) ("the Requesting Municipality shall provide defense for and defend, at its sole expense, any and all claims . . . directly or indirectly resulting from the rendering of aid by the County[.]").) Rather, in Westchester's view, the Agreement's "legal defense obligation should broadly cover the 'rendering of aid,' without exception or limitation." (*Id.*) While the language of legal defense obligation provision is indeed worded broadly, the provision providing a duty to defend was clearly meant to apply only to the conduct governed by the Agreement. Paragraph Seventh expressly applies to police services provided "pursuant to this Agreement." (Westchester Ex. 2 at 14.) As discussed above, the Mutual Aid Plan, and thus the Agreement, contemplated that when a signatory municipality assisted a requesting municipality, the County would also render aid. The provisions are therefore consistent with the Court's understanding of the limited situations in which a municipality may invoke the Agreement—a coordinated intermunicipal response to an emergency situation. Accordingly, as

the dispatching of police officers to Eastchester is not "mutual aid" within the scope of the Agreement, Paragraph Seventh does not apply to the aid rendered by the County.

### b. The "Specialized Police Services" Provision Is Inapplicable

The parties point to one other provision in the Agreement that allows for the provision of police services beyond "mutual aid." Paragraph Fifth(b) provides:

> "In addition to the mutual aid services provided pursuant to Paragraph FOURTH (a) of the Agreement, the parties expressly agree that a Signatory Municipality may request or provide, as part of its normal police functions, those specialized police services heretofore provided including, without limitation, administrative support, bomb, explosion and arson investigation including fire investigation services through the designated Cause and Origin Teams as set forth in the Westchester County Arson Zone Plan, whether provided by uniformed or non-uniformed police personnel."

(*Id.* at 14.) The referenced Paragraph Fourth(a) states: "In the event of such request for which no advance warning is available, any request for assistance may be made by telephone, directly by the Requesting Municipality to each Assisting Municipality." (*Id.* at 14.) Eastchester interprets this provision as a "savings clause" that permits Signatory Municipalities to continue to request and provide "specialized services" distinct from "mutual aid services" without triggering all the terms and conditions of the Agreement. Eastchester of course then argues that the "routine assistance" WCDPS provided in February 2001 "plainly falls within the savings clause, which expressly recognizes that such assistance may involve 'non-uniformed personnel.'" (Eastchester Mem. at 10.) In support, Eastchester points to the WCDPS website, which states that it serves as an "ever-present resource for local law-enforcement," and Calabrese's testimony, which states that municipalities request assistance from WCPD "all the time." (*Id.* at 10-11.) Westchester County counters that this provision simply clarifies that the Agreement is not precluding the signatories from requesting specialized services provided for by earlier inter-municipal agreements, and even

the aid at issue here constituted a "specialized police service" as opposed to a "mutual aid service," the legal defense obligation broadly applies to all aid. (Westchester Mem. at 5-6.)

The Court disagrees with both interpretations. First, there is nothing in the Agreement to suggest that it references or even invokes other inter-municipal agreements as Westchester asserts. While the Court agrees with Eastchester's take that this provision allows municipalities to provide "specialized services," there is also nothing in the Agreement to suggest that Paragraph Fifth(b) does not trigger all its terms and conditions. Rather, the use of the phrase "in addition to" and reference to Paragraph Fourth(a) indicate that this provision allows a Signatory Municipality to request additional specialized services. Accordingly, the Court construes this provision as stating that if a Requesting Municipality seeks mutual aid services, it may also request specialized police services beyond the uniformed police services detailed in the Mutual Aid Plan. As the Court has already determined that the aid Eastchester requested and received from WCDPS does not fall within the mutual aid services contemplated by the Agreement, such aid does not fall under Paragraph Fifth(b) either.

Regardless, the Court maintains that the provision of two police officers to assist in the investigation of a five-year-old double homicide does not constitute an "emergency" under the Agreement. The double homicide may have constituted an emergency in 1996, when the evidence and witnesses were still fresh and concerns for the public's safety immediately triggered.[6] By 2001 after the case had run cold, however, the Court stains itself to see how an anonymous tip given in Mount Vernon about a five-year old murder in Eastchester gave rise to an "emergency." Moreover, while the provision of forensic services as WCDPS did in 1996 (*See* Westchester Ex. 4 at 3621)

---

[6] The Court again reiterates that it agrees that a double homicide in a town where murder investigations are rare may give rise to the emergency situation contemplated by the Mutual Aid Plan. However, the Court finds the emergency situation did not persist five years later.

may constitute emergency "specialized services," the dispatching of couple detectives of similar rank to assist in an interrogation does not.

Both Westchester and Eastchester argue that the contract is unambiguous, they simply disagree on the unambiguous meaning of the contract. Upon due consideration of Agreement, The Court agrees with Eastchester's contention that the Agreement, including the defense obligation contained therein, does not apply to *any* police aid rendered by Westchester to the signatory municipality. (*See* Eastchester Reply at 2.) Ultimately, the terms and conditions of the Agreement, including the incorporated Mutual Aid Plan, clearly indicate that the police assistance provided by Westchester in February 2001—the dispatching of two officers to assist with a five-year-old homicide case—does not fall within the assistance contemplated by the Agreement. Given that the Court reaches its decision on this ground, it need not address any other grounds for dismissal.

The scope of the Agreement is therefore unambiguous, and the duty to defend and indemnification clause do not apply to the assistance Westchester provided to Eastchester in February 2001. Accordingly, the Court grants in part Eastchester's motion for summary judgment and denies Westchester's motion for summary judgment.

### B.  Eastchester's Motion for Summary Judgment

Westchester's Third-Party Complaint included five causes of action (1) duty to defend; (2) breach of contract; (3) contractual indemnification; (4) statutory indemnification; and (5) contribution. (Third-Party Complaint ¶¶ 67-97.) Eastchester argues the Court should dismiss all claims in Westchester's Third-Party Complaint because the Agreement does not govern the acts giving rise to the underlying action. Eastchester does not address each claim of Westchester's Third-Party Complaint, but instead contends that if the Court finds the Agreement inapplicable,

then "there is not valid basis for any other claims against [Eastchester], regardless of how those claims are characterized into various individual causes of action." (Eastchester Reply at 1.)

Having determined that the Agreement did not govern the acts giving rise to the underlying action, then any claims arising out of the Agreement between Westchester and Eastchester are properly dismissed. Accordingly, the Court grants Eastchester's motion for summary judgment with regards to Westchester's claims for duty to defend, breach of contract, and contractual indemnification. Westchester's other two claims, statutory indemnification and contribution, however, may not arise out of the Agreement. Accordingly, the Court addresses whether to grant summary judgment as to these two claims.

### A. Statutory Indemnification

Eastchester argues that because neither Commissioner D'Aliso or Chief Spiedell were authorized to request or grant police assistance as required under Section 209-m, the statute's indemnification provision cannot apply. (Eastchester Mem. at 11-16.) Westchester counters that the Agreement itself authorizes heads of departments, such as the Commissioner and Chief of Police, to grant or request police aid. Regardless, the County passed a local law in 1989 delegating such authority as in accordance with the statute. (Westchester Reply at 7-11.)

#### 1. Principles of Statutory Interpretation

A court interpreting statutory language "should attempt to effectuate the intent of the Legislature." *Manta Indus., Ltd. v. TD Bank, Nat'l Ass'n*, No. 17 CIV. 2495 (LAP), 2018 WL 2084167 (S.D.N.Y. Mar. 29, 2018) (citing *In re Shannon*, 34 N.E.3d 345, 351 (N.Y. 2015)). "Because the clearest indicator of legislative intent is the statutory text," the court "must begin with the language itself, giving effect to the plain meaning thereof." *Id.* "Where the language of a statute is clear and unambiguous, the courts must give effect to its plain meaning*." City of New*

*York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966(CBA), 2009 WL 2612345, at *29 (E.D.N.Y. Aug. 25, 2009) (internal quotations omitted) (collecting New York state cases).

### 2. Application

Section 209-m expressly authorized the chief executive officer ("CEO") of the municipality to grant or request police assistance and authorizes him or her to delegate those powers to the chief of the police department by local law. GML § 209-m(2)-(3). In the absence of such local law, the chief of police is authorized to request or grant police assistance if the CEO "is absent or disabled." Id.§ 209-m(4). Accordingly, the plain language of the statute authorizes the chief of police to act only if (1) the chief executive is absent or disabled or (2) a duly enacted local law has delegated the requisite authority to that position. As the chief executive is not alleged to have been absent or disabled, the only question is whether the municipalities enacted a local law delegating the requisite authority.

As discussed above, as the Court determined the Agreement does not govern the rendering of police aid by Westchester to Eastchester, then the arguments based on the Agreement's delegation do not apply here either to satisfy Section 209-m's requirements. That said, the Court will look to the 1989 Local Law to see if it did indeed delegate the requisite authority as Eastchester argues. The 1989 Local Law "authorize(s) the establishment of a Westchester County Police Mutual Aid and Assistance Plan to be effectuated by intermunicipal agreements."[7] (Westchester Ex. 1 at 1.) In Section 2, the Local Law states: "The Police Mutual Aid Plan is to be effectuated by intermunicipal-cooperation agreements between the County and the municipalities within the

---

[7] The Court briefly notes that the 1989 Local Law explicitly stating that the intermunicipal agreements it authorizes, including the Agreement, are to effectuate the Mutual Aid Plan further supports the Court's conclusion that actions covered under the Agreement were limited to emergency actions requiring coordinated municipal assistance as described in the Plan.

County of Westchester *whereby* the Chief Executive Officer or Chief of Police or participating municipality may request or grant police assistance." (*Id.*) As Eastchester argues, the 1989 Local Law indicates that the intermunicipal agreements would delegate the requisite authority, while the Law itself did not do so. (Eastchester Mem. at 14.)

Otherwise, Westchester fails to raise any other argument that does not rely on the Agreement or the 1989 Local Law to challenge Eastchester's contention that Chief Spiedell and Commissioner D'Aliso did not possess the authority required under Section 209-m. Accordingly, the Court finds that Chief Spiedell and Commissioner D'Aliso did not have authority to request or grant the dispatch of officers Doyle and Calabrese as required by the statute, and therefore Westchester's claims for statutory indemnification is dismissed.

### B.  Contribution

A claim for contribution "arises automatically when certain factors are present and does not required any kind of agreement between or among the wrongdoers." *Eisman v. Vill. of E. Hills*, 149 A.D.3d 806, 808, 52 N.Y.S.3d 115 (2017) (citing *Fox v. County of Nassau*, 183 A.D.2d 746, 747, 583 N.Y.S.2d 482)). "To sustain a third-party cause of action for contribution, a third-party plaintiff is required to show that a duty was owed to the plaintiffs as injured parties and that a breach of that duty contributed to the alleged injuries" *Id.* (citing *Guerra v. St. Catherine of Sienna*, 79 A.D.3d at 809, 913 N.Y.S.2d 709). "The critical requirement is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought" *Id.*at 808-809 (*Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.*, 71 N.Y.2d 599, 603, 528 N.Y.S.2d 516, 523 N.E.2d 803).

Here, Eastchester challenges the validity of Westchester's contribution claim on the grounds that Plaintiff dismissed all claims against Eastchester and the County, except those arising

out of "intentional wrongs or reckless conduct." (Eastchester Reply at 1 n.1.) Otherwise, Eastchester does not challenge this claim. Having failed to set forth any particular arguments or facts in support of this conclusory argument, Eastchester's motion for summary judgment on this claim is denied. *Roman v. City of Mount Vernon*, No. 21-CV-2214 (KMK), 2023 WL 8719968, at *14 (S.D.N.Y. Dec. 18, 2023) ("[T]he Court will deem an argument waived, where a party's argument is notably underdeveloped.") (collecting cases).

## CONCLUSION

For the foregoing reasons, the Third-Party Plaintiffs' motion is DENIED and Third-Party Defendant's motion is GRANTED IN PART and DENIED IN PART. The Court dismisses the following claims against Third-Party Defendant in the Third-Party Complaint: (1) duty to defend; (2) breach of contract; (3) contractual indemnification; and (4) statutory indemnification. Accordingly, the sole cause of action remaining in the Third-Party Complaint is contribution.

The Parties are directed to appear for a telephonic pre-trial conference on April 12, 2024 at 12 p.m. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest.

The Clerk of the Court is directed to terminate the motions at ECF Nos. 246 and 251.

Dated: March 4, 2024                                    SO ORDERED:
       White Plains, New York

                                        _____
                                              NELSON S. ROMÁN
                                           United States District Judge