UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SELWYN DAYS,

                                Plaintiff,

        -against -

THE COUNTY OF WESTCHESTER and
CHRISTOPHER CALABRESE,

                                Defendants.

18-CV-11538 (NSR)(AEK)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
COUNTY OF WESTCHESTER AND CHRISTOPHER CALABRESE'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**JOHN M. NONNA**
**WESTCHESTER COUNTY ATTORNEY**
*Attorney for Defendants*
Michaelian Office Building
148 Martine Avenue, 6th Floor
White Plains, New York 10601

***Attorneys of Record***:
Shawna C. MacLeod, Sr. Assistant County Attorney
Annmarie Stepancic, Sr. Assistant County Attorney

## Table of Contents

PRELIMINARY STATEMENT................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

LEGAL STANDARDS........................................................................................................5

ARGUMENT......................................................................................................................6

    I.  Plaintiff's Fifth Amendment Coercion Claim (Count II) Fails as a Matter of Law ....................6

        A.  Calabrese Never Interacted with or Interviewed Days ................................................6

        B.  Calabrese Did Not Fail to Intervene in Unconstitutional, Coercive Conduct....................7

            1.  Law Regarding Involuntary Confessions........................................................................8

            2.  Calabrese Did Not Witness Any Coercion ....................................................................9

            3.  Calabrese Is at Least Entitled to Qualified Immunity on the Coercion Claim ............12

    II.  Plaintiff's Fair Trial and Due Process Claims (Count I) Are Deficient.....................................13

        A.  The Fair Trial Claim Regarding Mayhew's Statements Fails .................................................15

            1.  No Fabricated Evidence ................................................................................................15

            2.  No *Brady* Violation.....................................................................................................16

        B.  The Fair Trial Claim Regarding Days's Allegedly False Confession Fails .........................18

            1.  No Fabricated Evidence ................................................................................................18

            2.  No *Brady* Violation.....................................................................................................18

        C.  Calabrese is Entitled to Qualified Immunity on Plaintiff's Fair Trial and *Brady* Claims ...20

    III.  Plaintiff's Federal & State Malicious Prosecution Claims (Counts III, VII) Fail ....................21

        A.  Law Regarding Malicious Prosecution..................................................................................21

        B.  Calabrese Did Not Maliciously Prosecute Days ...................................................................22

            1.  Calabrese Did Not Initiate the Proceeding ..................................................................22

            2.  There Was Probable Cause to Prosecute Days .............................................................23

3.  Calabrese Did Not Have Actual Malice............................................................23

4.  Calabrese Should Be Protected by Qualified Immunity on This Claim ........................24

5.  The County Is Not Liable............................................................................24

IV.  Plaintiff's *Manuel* Claim (Count IV) Against Calabrese Is Deficient as a Matter of Law .......24

V.  Plaintiff's Claims Under the New York State Constitution (Count IX) Fail ...........................25

CONCLUSION...................................................................................................25

## <u>Table of Authorities</u>

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...........................................................................24

*Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016) (summary order), *cert. denied*, 138 S. Ct. 78

    (2017) ......................................................................................................................................16

*Buari v. City of N.Y.*, 530 F. Supp. 3d 356 (S.D.N.Y. 2021)................................................. 7, 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................5

*Cerrone v. Brown*, 246 F.3d 194 (2d Cir. 2001) .......................................................................12

*Clewis v. Texas*, 386 U.S. 707 (1967) ........................................................................................8

*Colon v. City of N.Y.*, 60 N.Y.2d 78, *rearg denied*, 61 N.Y.2d 670 (1983) ...........................22

*Culombe v. Connecticut*, 367 U.S. 568 (1961).........................................................................8

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003) ....................................5

*Days v. EPD*, No. 18-CV-11538 (NSR), 2020 U.S. Dist. LEXIS 164489 (S.D.N.Y. Sept. 9, 2020) ......7

*Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ............................................7

*Fare v. Michael C.*, 442 U.S. 707 (1979) ...................................................................................8

*Frazier v. Cupp*, 394 U.S. 731 (1969).........................................................................................9

*Gallegos v. Colorado*, 370 U.S. 49 (1962) .................................................................................8

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ...........................14, 16

*Girau v. Europower, Inc.*, No. 10-CV-4320 (NSR), 2017 U.S. Dist. LEXIS 149410 (S.D.N.Y. Sep.

    14, 2017) ..................................................................................................................................5

*Holbrook v. Flynn*, 475 U.S. 560 (1986).................................................................................14

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501 (S.D.N.Y. 2008)............................................7

*Jenkins v. City of N.Y.*, 478 F.3d 76 (2d Cir. 2007)..................................................................12

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) .......................................................................14

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995) ........................................................................12

*Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109 (2d Cir. 2015) ...............................................18

*Lowth v. Tn. of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) .....................................................24

*Maldonado v. City of N.Y.*, 11-CV-3514 (RA), 2014 U.S. Dist. LEXIS 26239 (S.D.N.Y. Feb. 26, 2014) ...................................................................................................................... 24, 25

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................................12

*Manganiello v. City of N.Y.*, 612 F.3d 149 (2d Cir. 2010) .................................................21, 22

*Manuel v. Joliet*, 580 U.S. 357 (2017) ...................................................................................24

*McLaughlin v. New York*, No. 11-CV-1242 (SHS), 2013 U.S. Dist. LEXIS 106482 (S.D.N.Y. July 30, 2013) ..........................................................................................................................6

*Mitchell v. Home*, 377 F. Supp. 2d 361 (S.D.N.Y. 2005) ......................................................14

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997) .......................................................................21

*Newton v. City of N.Y.*, 640 F. Supp. 2d 426 (S.D.N.Y. 2009) ..........................................22, 23

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) .....................................................................7

*People v. Days*, No. 0469/01, 26 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 31, 2009) ...............13

*Procunier v. Atchley*, 400 U.S. 446 (1971) ..............................................................................9

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ..........................................7, 14, 15, 18

*Rothstein v. Carriere*, 373 F.3d 275 (2d Cir. 2004) ...............................................................21

*Savino v. City of N.Y.*, 331 F.3d 63 (2d Cir. 2003) .................................................................22

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) .................................................................. 8, 9

*Smith v. United States*, 348 U.S. 147 (1954) ...........................................................................9

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191 (2000) ....................................................................21

*Spano v. New York*, 360 U.S. 315 (1959) ...............................................................................11

*Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127 (2d Cir. 2013) ....................................6

*Stansbury v. Wertman*, 721 F.3d 84 (2d Cir. 2013) ...................................................................22

*Svenningsen v. Ultimate Prof'l Grounds Mgmt., Inc.*, No. 14-CV-5161 (NSR), 2017 U.S. Dist. LEXIS
     50411 (S.D.N.Y. Mar. 31, 2017) .............................................................................................6

*Thomsen v. City of N.Y.*, No. 15CV2668 (DLC), 2016 U.S. Dist. LEXIS 17079 (S.D.N.Y. Feb. 11,
     2016) ............................................................................................................................. 8, 23, 24

*United States ex rel. Daniel v. Wilkins*, 292 F.2d 348 (2d Cir. 1961) .......................................12

*United States v. Allen*, 2013 U.S. Dist. LEXIS 82564 (D. Vt. 2013) .........................................11

*United States v. Hunter*, 32 F.4th 22 (2d Cir. 2022) ..................................................................14

*United States v. Kartrell Young*, 2024 U.S. Dist. LEXIS 36922 (D. Minn. 2024) .......................11

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) .................................................................14

*United States v. Medunjanin*, 752 F.3d 576 (2d Cir. 2014) ........................................................11

*United States v. Osbourne*, No. 14-CR-6136 (FPG), 2016 U.S. Dist. LEXIS 188430 (W.D.N.Y. Oct.
     5, 2016), *report and recommendation adopted*, No. 14-CR-6136-FPG, 2017 U.S. Dist. LEXIS
     104808 (W.D.N.Y. July 6, 2017) ..........................................................................................20

*United States v. Smith*, 574 F.2d 707 (2d Cir.), *cert. denied*, 439 U.S. 986 (1978) ..........................8

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014) .....................................................................8

*Walker v. City of N.Y.*, 974 F.2d 293 (2d Cir. 1992) ...................................................................14

*Weaver v. Brenner*, 40 F.3d 527 (2d Cir. 1994)............................................................................7

*White v. Pauly*, 580 U.S. 73 (2017) (*per curiam*) .......................................................................13

*Withrow v. Williams*, 507 U.S. 680 (1993) ...................................................................................8

**Statutes**

42 U.S.C. § 1983.............................................................................................................................6

**Rules**

Fed. R. Civ. P. 56 ...........................................................................................................................5

## PRELIMINARY STATEMENT

In February 2001, Selwyn Days ("Days" or "Plaintiff") confessed to a double-murder during an interview by three officers of the Eastchester Police Department ("EPD"), while he was being held in Mount Vernon Police Department ("MVPD") custody for violating an order of protection obtained by his ex-girlfriend, Cherlyn Mayhew. After Days was arrested on the violation of the order of protection, Mayhew implicated him in the double-murder, placing an anonymous call to the MVPD and saying Days had confessed to her. Upon Eastchester's request for assistance, then-Lieutenant[1] Christopher Calabrese and Detective John Doyle of the Westchester County Department of Public Safety ("WCDPS") located and interviewed Mayhew, who admitted to placing the anonymous call and provided a detailed statement against Days. Only after receiving Mayhew's statement, and after relaying the information to EPD, did Calabrese observe, through a live video feed from a monitoring room, the last part of EPD officers' interview of Days. This portion of the interview resulted in Days's own confession to the murders. Calabrese recorded the confession on an analog Video Home System (VHS) tape. Days later recanted his confession, claiming it was compelled by EPD through coercive tactics. Nevertheless, the video confession was admitted as evidence in all five of Days's criminal trials.

Despite Calabrese's very limited involvement, Days claims Calabrese violated his right to a fair trial; violated his right against self-incrimination; maliciously prosecuted him; and detained him without probable cause.[2] Summary judgment is appropriate here, as: (1) Calabrese did not forward fabricated evidence to or withhold material evidence from prosecutors; (2) Calabrese did not witness any coercion of Days, such that he would have been obligated to intervene in the EPD interview during Days's confession; (3) Calabrese did not "initiate" or continue any prosecution against Days, had no actual malice, and in fact had probable cause to believe Days was guilty of the murders; and

---

[1] Hereinafter, all references to rank reflect the rank of the individuals at the time of the relevant facts.

[2] Days also sued the EPD officers and the Town of Eastchester, who have settled their claims, leaving Westchester County and Christopher Calabrese as the sole remaining defendants.

(4) Calabrese is entitled to qualified immunity on each of the claims against him. Further, Plaintiff has stipulated that the only claims still at issue are those that can be classified as "intentional wrongs" or "reckless conduct." Plaintiff has failed to make such a showing with respect to any of his claims. For all these reasons, and those that follow, this Court should grant summary judgment to Defendants.

## STATEMENT OF FACTS

On November 21, 1996, the bodies of Archie Harris and Betty Ramcharan, Harris's home health aide, were discovered at Harris's home in Eastchester, New York. MacLeod Decl. Ex. A[3] (EPD Reps.) TOE3610-14, TOE3621; Ex. B (Barletta Dep.) 79-80, 89-90. Officers of the EPD went to the scene, and shortly thereafter, EPD contacted WCDPS for assistance with the investigation. Ex. A at TOE3610-14, TOE3621; Ex. B at 86-90, 101-103, 113-14; Ex. C (Calabrese Dep.) 31-32, 97-98. Lieutenant Calabrese of WCDPS assigned Det. John Doyle to assist Eastchester with the murder investigation. Ex. C at 31-32, 96-98. The 1996 Eastchester double homicide investigation, though ongoing, would remain unsolved until February 2001. Ex. B at 106; Ex. C at 105-106.

On February 15, 2001, a police officer with MVPD informed EPD that they had Selwyn Days in custody for a violation of an order of protection, and that an anonymous caller said that Days had admitted to killing two people in Eastchester. Ex. D (Kiernan Dep.) at 200-02, Ex. C at 114-115. EPD Lt. Mario Astarita and EPD Detective Matthew Kiernan, the lead officer on the Harris-Ramcharan homicide case, went to MVPD to question Plaintiff. Ex. D at 200-02; Ex. F (Astarita Dep.) 43, 115-16. Days was the son of Stella Days, a former health aide in Harris's home, who had accused Harris of sexual assault in the summer of 1996, a few months before the November 1996 murders. Plaintiff's mother had worked with EPD (specifically Barletta) on her case against Harris. Ex. A at TOE296; Ex. B 137-38, 43-44. At Kiernan's request, Calabrese and Doyle traveled to MVPD, where Plaintiff was being held, arriving at approximately 4:30 p.m. Ex. C 106-113. As EPD officers interviewed Days,

---

[3] Exhibits referenced in this brief are attached to the Declaration of Shawna C. MacLeod, dated June 26, 2024.

Calabrese and Doyle attempted to identify the anonymous caller. *Id.* at 113-16. MVPD Captain Raynor opined that the anonymous caller seemed to be a black female in her 30s or 40s. *Id.* at 116-18; Ex. E (Calabrese Notes) at DAYS13779. Cherlyn Mayhew was thus a logical place to start: she was the protected party on the order of protection that Plaintiff had violated, leading to his arrest, and she fit Captain Raynor's description. Ex. C 115-118; Ex. E at DAYS13779.

Beginning at around 5:30 p.m., Calabrese briefly observed the Eastchester officers' conversation with Plaintiff, spoke with Captain Raynor, obtained Mayhew's last-known address, and prepared to search for Mayhew. Ex. C 119-123; Ex. G (First Trial Tr.) DAYS2229-2232; DAYS2283-2284.  Ex. E (DAYS 011743-46); Ex. H (Fourth Trial Tr.) DAYS11743-46. Calabrese and Doyle traveled to Mayhew's residence, arriving at approximately 6:45 p.m. Ex. G at 2234-2235. She was not there, but they spoke with her boyfriend, Darnell Getter, and then continued searching. Ex. C at 140-143. Calabrese and Doyle returned to Mayhew's residence at around 8:00 p.m. where they waited for her return. *Id.* at 142-43; Ex. G DAYS2234-2235, 2285. Mayhew arrived home at approximately 9:00 p.m. Ex. G at DAYS2235-36, 2285. She agreed to go to the MVPD, and she drove herself to the station, accompanied by Getter. Ex. C 143-45; Ex. I. at DAYS13779. During two separate interviews with Calabrese and Doyle, Mayhew stated that she did, in fact, place the anonymous call; that Plaintiff had told her he killed two people in Eastchester; and that there was a prior incident, where Plaintiff had mentioned the murders. Ex. I. Start to finish, Calabrese was discussing the anonymous call; searching for, locating, and interviewing Mayhew; and then conducting follow-up paperwork and eating dinner from approximately 6:00 pm until after midnight. 56.1 Stmt. ¶¶ 11-28. Calabrese later testified that Mayhew was "a reliable source information." Ex. C at 248.

Thus, Calabrese was not present during most of the time that EPD officers questioned Plaintiff. Kiernan and Astarita's initial questioning lasted approximately five hours and fifteen minutes. Ex. D at 215-216, 218 (noting "lulls and breaks" in conversation). After Calabrese relayed to Kiernan

and Astarita that Mayhew had implicated Plaintiff in the 1996 double homicide, Kiernan and Astarita decided they would interview Plaintiff again. Ex. G at DAYS2303-04; Ex. F at 128-29. At this point, the officers discussed that if and when Days "started to give relevant information," Calabrese and Doyle would record the interview from the monitoring room across the hall, which was equipped with a VCR. Ex. C at 207-08; Ex. D at 220. Kiernan and Astarita then commenced the interview with Days, and were joined by EPD officer George Barletta. Ex. C at 207-211, 249-50. Sometime after Barletta arrived, Plaintiff confessed to murdering both Harris and Ramcharan. *Id.* at 211-12, 249-250; Ex. N (2/16/ 2001 Notes of S. Days Interview) DAYS13786-87.

At the time, it was not standard practice for EPD or WCDPS to record their interrogations; nor was such a recording required by local, state, or federal law. Ex. C at 259-60. Once Plaintiff began discussing the murders at approximately 1:30 a.m., Calabrese attempted to record, but "didn't have a [VHS] tape"; the drawer in the monitoring room that was meant to contain blank VHS tapes was empty. Ex. C at 208-211. Calabrese explained that while "it would have been better if we had a tape from the very beginning," when Days started to confess to the murders, he did the "best [he] could" to take contemporaneous notes, while simultaneously searching the monitoring room for a videotape. *Id.* Ultimately, Calabrese located a videotape[4] and started to record the interview at 1:42 a.m. Ex. C at 211; 211; Ex. N, DAYS13787. The recording lasted approximately 75 minutes. Ex. O. None of the first, lengthier questioning by Astarita and Kiernan was recorded. Following the recorded confession, Days called his mother at around 3:00 a.m. and said, "they got me for what I did to Archie." *Days v. State of N.Y.*, 2023 N.Y. Misc. LEXIS 1558 (Ct. of Claims Apr. 7, 2023); Ex. G (Prisco Dep.) 53.

A grand jury convened by the Office of the Westchester District Attorney ("DA") subsequently indicted Plaintiff for the murders. Ex. G at 41-42. At a pretrial hearing, the trial court

---

[4] Calabrese was not in his normal work location, and had difficultly locating the videotape in an unfamiliar police station. Ex. C at 208-211.

denied Plaintiff's motion to suppress the video recording and ruled that the confession was voluntary and admissible. Ex. G at 43-45, 69-70. The video was admitted into evidence at each of his five subsequent murder trials (*id.* at 45; Am. Compl. ¶ 88), which resulted in, respectively: a hung jury; a conviction that was later overturned based on ineffective assistance of counsel; another hung jury; a conviction that was later overturned on the ground that the court had erroneously refused to allow expert testimony on false confessions; and—in 2017—an acquittal.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 against the Eastchester Police Department, Town of Eastchester, Astarita, Barletta, Kiernan, the County of Westchester, and Calabrese on December 11, 2018. Compl., ECF No. 1. The Court granted in part and denied in part the Westchester Defendants' motion to dismiss, ECF No. 65, and denied the Eastchester Defendants' motion to dismiss. ECF No. 103. By stipulation dated February 8, 2022 (the "Stipulation") (ECF No. 210), Plaintiff agreed to dismiss all claims against the Eastchester Defendants, as well as all claims against the Westchester Defendants, except for those claims predicated upon "intentional wrongs or reckless conduct." *See* ECF No. 210, at 2.

## LEGAL STANDARDS

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). The Court must construe the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences against the movant. *Dallas Aerospace*, 352 F.3d at 780.

As this Court has noted, "a party [may] demonstrate its entitlement to summary judgment by showing a lack of evidence supporting the non-moving party's position." *Girau v. Europower, Inc.*, No. 10-CV-4320 (NSR), 2017 U.S. Dist. LEXIS 149410, at *10 n.4 (S.D.N.Y. Sep. 14, 2017); *see also Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56[] mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Svenningsen v. Ultimate Prof'l Grounds Mgmt., Inc.*, No. 14-CV-5161(NSR), 2017 U.S. Dist. LEXIS 50411, at *14 (S.D.N.Y. Mar. 31, 2017) (same). A plaintiff opposing summary judgment "must offer some hard evidence in support of [his] factual assertions." *McLaughlin v. New York*, No. 11-CV-1242 (SHS), 2013 U.S. Dist. LEXIS 106482, at *13 (S.D.N.Y. July 30, 2013) (citation and internal quotation marks omitted); *see also Svenningsen*, 2017 U.S. Dist. LEXIS 50411, at *14 (explaining that the "nonmoving party may not rely on conclusory allegations or unsubstantiated speculation" in opposing summary judgment) (internal quotation marks omitted).

Plaintiff's federal claims are all pleaded under 42 U.S.C. § 1983, which imposes civil liability on any person who, acting under color of state law, deprives a United States citizen of a federal constitutional or statutory right. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013).

In this case, Plaintiff has stipulated that only claims supported by "intentional wrongs or reckless conduct" are still at issue. Thus, as a matter of law, any act of Calabrese's that does not rise to reckless or intentional conduct cannot support a claim for relief, and that claim must be dismissed.

## **ARGUMENT**

**I.    Plaintiff's Fifth Amendment Coercion Claim (Count II) Fails as a Matter of Law**
    **A.  Calabrese Never Interacted with or Interviewed Days**

Plaintiff does not allege that Calabrese actually coerced[5] his confession. Nor could he: Plaintiff admitted that he never saw Calabrese or heard his voice in February 2001; he is still not even sure who

---

[5] A plaintiff may bring a Fifth Amendment self-incrimination claim through the Fourteenth Amendment and Section 1983 "if coercion was applied to obtain a waiver of the plaintiff['s] rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff in

Calabrese is. Ex. L (Days Dep.) 414-18. Plaintiff's allegations about coercion pertain to the Eastchester officers, who are no longer a part of this case. (For their part, Eastchester and its officers have denied these allegations. ECF No. 93.) With respect to Calabrese, the operative complaint alleges a tangential role in Plaintiff's questioning: specifically, plaintiff claims that Calabrese did not record (from a monitoring room in the MVPD) the entirety of Plaintiff's interview. Am. Compl. ¶¶ 82, 85. This allegation does not amount to "coercion," nor is it part of any imagined "conspiracy" to coerce—a claim that is completely unsupported. *Id.* at ¶¶ 85, 137.

### B. Calabrese Did Not Fail to Intervene in Unconstitutional, Coercive Conduct

In the absence of any direct allegations of coercion against Calabrese, this Court has construed Plaintiff's claim, as pleaded, as one for a "failure to intervene" in the alleged coercion by the EPD officers. *Days v. EPD*, No. 18-CV-11538 (NSR), 2020 U.S. Dist. LEXIS 164489 (S.D.N.Y. Sept. 9, 2020). To establish liability on such a theory, a plaintiff must show "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)). "[T]here can be no failure to intervene claim without a primary constitutional violation." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021) (internal quotation marks omitted). Further, the failure to intervene must be under circumstances making it objectively unreasonable for an officer to believe that his fellow officers' conduct did not violate the Plaintiff's constitutional rights. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997). Given the terms of the Stipulation, Plaintiff must also demonstrate that Calabrese's failure to intervene was reckless or intentional.

---

a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998); *Weaver v. Brenner*, 40 F.3d 527, 535 (2d Cir. 1994).

Considering the evidence, no reasonable jury could conclude that Calabrese failed to intervene in coercion. Calabrese was not present for Plaintiff's interview—including any intervening breaks in the interview—for more than six hours, while he was preparing to search for, out looking for, locating, and subsequently interviewing Mayhew at the MVPD. 56.1 Stmt. ¶¶ 11-28. When Calabrese did observe Days beginning at approximately 1:00 a.m. on February 16, 2001, he took contemporaneous notes when Days spoke about the Eastchester murders and then recorded Days's interview (including Days's confession) for approximately 75 minutes thereafter. 56.1 Stmt. ¶ 31-65. As demonstrated below, nothing he witnessed constituted coercion.

### 1. Law Regarding Involuntary Confessions

"A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). "The voluntariness inquiry should examine the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Id.* at 24 (internal quotation marks omitted); *see Thomsen v. City of N.Y.*, No. 15CV2668 (DLC), 2016 U.S. Dist. LEXIS 17079, at *26 (S.D.N.Y. Feb. 11, 2016) (same). As to the characteristics of the accused, relevant factors may include the suspect's age, intelligence, and education, as well as familiarity with the criminal justice system. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (collecting factors); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (collecting factors); *Fare v. Michael C.*, 442 U.S. 707, 725-26 (1979) (criminal justice experience); *Clewis v. Texas*, 386 U.S. 707, 712 (1967) (limited educational attainment); *Culombe v. Connecticut*, 367 U.S. 568, 620 (1961) (intellectual disability); *United States v. Smith*, 574 F.2d 707 (2d Cir.), *cert. denied*, 439 U.S. 986 (1978) (17 year old's confession held voluntary despite low I.Q. because of numerous prior contacts with police); *Gallegos v. Colorado*, 370 U.S. 49, 53 (1962) (age). Regarding the interrogation and the conduct of law enforcement, some factors include the length of detention, the repeated and prolonged nature of the questioning, and the

use of physical punishment, such as the deprivation of food or sleep. *Bustamonte*, 412 U.S. at 226. (collecting cases).

Although there are no bright-line rules, numerous police tactics have been considered by the Supreme Court, and the lower courts, which do not demonstrate involuntariness. For instance, police officers may deceive suspects through appeals to a suspect's conscience; by posing as a false friend; and by means of trickery and bluff. *See, e.g.*, *Procunier v. Atchley*, 400 U.S. 446, 453-54 (1971) (suspect was deceived into confessing to false friend to obtain insurance payout to children and stepchildren); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (deceiving suspect about another suspect's confession). Notably, even if a confession is false, it does not necessarily follow that it was coerced. *See Smith v. United States*, 348 U.S. 147, 153 (1954) ("[T]he experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made.").

### 2. Calabrese Did Not Witness Any Coercion

No constitutional violation occurred during the limited portion of the interview that Calabrese observed. Thus, he cannot be secondarily liable for coercion, even based on a "failure to intervene" theory.  Rather, a review of Calabrese's notes and of the confession video demonstrates that Calabrese observed three officers using common investigatory techniques: they urged Plaintiff to tell the truth; they spoke in a sympathetic tone; and they occasionally asked pointed questions to confront Plaintiff with information they knew or that he had already supplied, to keep the interview focused.

Critically, during this time, EPD officers made no threats against Plaintiff, or against Plaintiff's family members. Ex. C at 244. EPD officers used no physical force against Plaintiff. *Id.* EPD officers made no offers of inducement or specific promises of leniency—to the contrary, they indicated that Days may be in trouble for the murders to which he had just confessed, but that it was not for them to say. Ex. Q (Tr. of Days Interview), DAYS15919-20 (Days: "I'm in a lot of trouble, right?" . . . . "You know, we can't say whether you're in a lot of trouble."). Plaintiff also showed no signs of physical

distress during this portion of the interview. When Calabrese began to observe Day's questioning, Plaintiff had just returned from a break. Ex. C at 230 ("He was on a break [and] not being interviewed when we came back in the building and we saw him go into the room."). Days himself indicated that he was alert. When asked if he "mind[ed]" continuing with the questioning given the late hour, Days explained that he was not tired. Ex. Q, DAYS15914 (Astarita: "Can we go over this one more time? Do you mind? One more time, then you'll be able to get some z's." Days: "I'm not tired." Astarita: "You're not tired?" Days: [Shakes head].)) The timeframe of the interviews was also not concerning to Calabrese, since he Days had taken a break, Days stated himself that he was not tired, and given Calabrese's own observation that Days was permitted to drink and smoke cigarettes. Ex. C at 228-30; Ex. O at 30:20 – 30:34.

While observing Plaintiff, Calabrese had no reason to believe that Days had a low IQ. Ex. C at 266-67.[6] Days, who was 36 years old at the time of the interview, had prior experience with the criminal justice system, having been arrested previously for stabbing Mayhew's husband, and for stabbing his own brother before that.[7] Ex. L at 28, 58-59, 62-63, 275-77, 545-546. To Calabrese, Days appeared to speak openly and voluntarily, offering facts regarding the crime scene in narrative form in response to open-ended questions. Ex. C at 214-219, 245, 250. In fact, Calabrese described the interview as "a conversation, nonconfrontational," and explained that Days was "carrying on normal conversation with the Eastchester detectives." *Id.* at 240-41, 267.

Plaintiff cites "leading questions" and the use of a "moral justification" as coercive attempts to get Plaintiff to confess, which he alleges can be viewed on the recording. Am. Compl. ¶¶ 105-108. But neither of these factors, even if present, constitutes coercion. First, asking some leading questions

---

[6] Indeed, Plaintiff was accepted to, and took and passed courses at, Monroe College, and he took courses at Westchester Community College. Ex. L at 251-252, 511-512. He also worked as a nurse's aide. *Id.* at 69-71.
[7] Days denies having stabbed both his brother and Michael Mayhew, but admits to his involvement with the criminal justice system. Ex. L at 58-59, 275-77, 545-546.

during an interrogation—to the extent any questions in Days's interview could be construed as "leading"—does not violate the Constitution. *See, e.g.*, *United States v. Allen*, 2013 U.S. Dist. LEXIS 82564, *21-22 (D. Vt. 2013) ("Although Defendant accurately characterizes the detectives' questions as leading, there is no prohibition on leading questions and in this case the detectives did not use such questions to badger or trick Defendant . . . ."); *United States v. Kartrell Young*, 2024 U.S. Dist. LEXIS 36922, *19 (D. Minn. 2024) ("[A]ny assertions that [the officer] used leading questions or prodded [suspect] to provide information, even taken together, are insufficient to support a finding of coercion."); *cf. Spano v. New York*, 360 U.S. 315, 322 (1959) (confession coerced where foreign-born petitioner confessed after eight-hour interrogation that included total lack of narrative statement, and only answers to the leading questions of a skilled prosecutor, eight detectives, a lieutenant, a sergeant, and a patrolman).

Discussing a potential motive or justification for the crime—here, related to Harris's sexual assault of Stella Days—is also not constitutionally suspect. Courts have repeatedly upheld appeals to the defendant's emotions, including references to a suspect's family members. *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 588 (2d Cir. 2014) (upholding confession as voluntary despite police encouraging defendant to think about what he was putting his parents through). And here, Days voluntarily offered and explained the scenario that led to his going to Harris's home in November 1996: he did not aim kill Harris, only to confront Harris about "hurt[ing] his mother"; but as the situation escalated, Days did kill him. Ex. Q (DAYS15874-77).

Further, Calabrese observed EPD officers imploring Days to tell the truth while he confessed to the murders—not to lie, and not to speak if he did not remember. Ex. Q, DAYS15938 (Kiernan: "If you don't remember, you don't remember. Don't lie."; Astarita: "This is all your story now. Right? You told us this all yourself. I mean this is exactly what happened? Huh? Days: (Nods head). "Yeah." Astarita: "You telling the truth?" Days: [nods head]; Barletta: "I'm just asking if you remember.").

11

As an investigatory officer for decades at the time of his February 2001 observation of Plaintiff's interrogation, Calabrese believed that, based on what he saw and his years of experience, the EPD officers "treated [Plaintiff] with respect." Ex. C at 245. During portions of the interview when more pointed questions were being asked, Calabrese "saw nothing that . . . needed intervention to stop the interview." *Id.* at 226. In sum, as far as Calabrese was aware, the questioning did not involve any "trickery, humiliation," threats, "extreme youth," or low IQ of the Plaintiff, which could contribute to findings of coercion in cases where prolonged questioning has occurred. *See, e.g.*, *United States ex rel. Daniel v. Wilkins*, 292 F.2d 348, 349-50 (2d Cir. 1961) (no coercion as a matter of law where plaintiff was arrested after midnight, was allowed food, coffee, and cigarettes, was interrogated for five hours until 6 a.m., went to separate location with officers for two hours, and upon further interrogation from 8 a.m. to noon, made confession).

### 3. Calabrese Is at Least Entitled to Qualified Immunity on the Coercion Claim

Even viewing the allegations against Calabrese in the light most favorable to Plaintiff, Calabrese is at least entitled to qualified immunity on the coercion claim. "Qualified immunity shields government officials from liability for civil damages . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks omitted).

Here, it was objectively reasonable for Calabrese to have believed that the actions the EPD officers took, in the portion of the interview that Calabrese observed, were lawful. In 2001, no

controlling law precluded police from asking pointed or leading questions during an interview, or from discussing a potential motive for the murders. Moreover, and relevant here to Plaintiff's claims (and any related issues of fact) that EPD officers threatened Days's family or "slapped" him during prior portions of the interview that Calabrese did not observe,[8] nothing required Calabrese to question the earlier actions of the primary EPD officers on the case, because no constitutional principle "require[d] [him] to second-guess the earlier steps already taken by his . . . fellow officers." *White v. Pauly*, 580 U.S. 73, 80 (2017) (*per curiam*). It also bears repeating that Plaintiff contested the voluntariness of his confession throughout the criminal proceedings against him, with varying outcomes from judges and juries over fourteen years. Despite his initial pretrial motion to suppress, Days's confession was deemed voluntary at a *Huntley* hearing, and then it was introduced at all five criminal trials. One judge explained that the video recording "discloses telltale signs of [the confession's] general veracity," for example, when the defendant asks "[d]id you all know that I had something to do with it?" and "why did it take you all so long to come get me?" *People v. Days*, No. 0469/01, 26 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 31, 2009). Under these circumstances, Calabrese should at least be entitled to qualified immunity as to whether Plaintiff was coerced during the portion of the interview he saw, as it was objectively reasonable for him to believe that not intervening in the interview was lawful.

## II.    Plaintiff's Fair Trial and Due Process Claims (Count I) Are Deficient

Plaintiff has not adduced any evidence that Calabrese deprived him of the right to a fair trial. He alleges two theories of the claim: fabrication-of-evidence and a *Brady* violation. To establish a fabricated evidence claim, a plaintiff must show that "(1) [an] investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover*

---

[8] Plaintiff alleges repeatedly in his Amended Complaint that the Eastchester officers threatened him with the death penalty if he did not confess, Am. Compl. ¶¶ 79, 136, 150, but admitted this was not true during his deposition. Days Dep. 476.

*Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016); *see Ricciuti*, 124 F.3d at 130.[9] A *Brady* violation claim requires a showing that (1) favorable exculpatory or impeachment evidence (2) was suppressed by the State, and (3) prejudice ensued—meaning that "there is a reasonable probability that the suppressed evidence," had it been presented at trial, "would have produced a different verdict." *United States v. Hunter*, 32 F.4th 22, 30-31, 35 (2d Cir. 2022); *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (setting forth elements). Police officers satisfy their *Brady* obligations by turning over evidence to the prosecutor, not the defendant. *Walker v. City of N.Y.*, 974 F.2d 293, 299 (2d Cir. 1992). Because a *Brady* violation requires that prejudice ensue, "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations omitted).

Plaintiff offers only conclusory and speculative assertions in his Amended Complaint that Calabrese "fabricated" and forwarded evidence to, or withheld any material evidence from, prosecutors. *First*, with respect to Mayhew: Days alleges that Calabrese "improperly coerced and manipulated Mayhew to falsely implicate Days in the Eastchester murders," and then "suppressed valuable evidence about the unreliable Mayhew information by failing to videotape the pretaping portions of her interview," which he says "created a misleading and false impression of the quality of her information." Am. Compl. ¶¶ 134-135. *Second*, with respect to Days: there are no allegations that Calabrese coerced Days into confessing to the murders. Rather, Plaintiff speculates that Calabrese "conspired" with EPD officers Astarita, Kiernan, and Barletta "not to videotape the interrogation of Days, despite having the capacity to do so, in an effort to hide the improper conduct" that the Eastchester officers allegedly "employed to get Days to falsely confess." Am. Compl. ¶ 137. Plaintiff further asserts that the officers, including Calabrese, "omitted in their discussions with prosecutors

---

[9] The claim is rooted in the Sixth Amendment and Due Process Clauses of the Fifth and Fourteenth Amendments. *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Mitchell v. Home*, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005).

the coercive and deceptive techniques they used to get the unreliable and false information." Am. Compl. ¶ 138. As discussed below, these allegations are baseless.

### A. The Fair Trial Claim Regarding Mayhew's Statements Fails

#### 1. No Fabricated Evidence

Initially, there is no dispute that Mayhew made the anonymous call to the MVPD, informing the police that Plaintiff committed the Eastchester murders. This fact was not "fabricated" by Calabrese. Plaintiff himself recognizes that "Mayhew was the obvious choice [as the anonymous caller] as she was the victim on the violation of order of protection case." Am. Compl. ¶ 64. But Days speculates—after acknowledging that Mayhew made the anonymous call—that she "falsely elaborated" on her tip in the face of "ramped up . . . pressure" by Calabrese. Am. Compl. ¶ 68. Presumably, Plaintiff asserts that this amounts to "fabrication." "Fabrication" is a poor label for Plaintiff's allegations about Mayhew's statements, however, and thus the claim falls outside of the Second Circuit's fair trial jurisprudence. *C.f.*, *e.g.*, *Ricciuti*, 124 F.3d at 126 (plaintiff claimed that his reported confessionary statements were fabricated by officers from whole cloth).

1.      Regardless, there is no evidence of Calabrese's manipulation or pressure of Mayhew. The record shows instead that Mayhew cooperated willingly with Calabrese, while Calabrese attempted to make the experience feel as relaxed and safe as possible for her. 56.1 Stmt. ¶¶ 16-29. The undisputed facts show that after Calabrese located Mayhew, she drove herself to the MVPD voluntarily, with her then-boyfriend. *Id.* ¶ 16. Upon arrival at the MVPD, Mayhew met with Calabrese and Doyle in an interview room (with no video-recording capacity), where she and the officers had a preliminary conversation, and then discussed the anonymous call. *Id.* ¶¶ 18-21. Once Mayhew admitted she placed that call to the MVPD, she provided information to Calabrese and Doyle that Days had told her that he had killed two people in Eastchester. *Id.* ¶¶ 20-21. Calabrese and Doyle's initial interview of Mayhew lasted about 40 minutes, after which they took a break at her request. *Id.* ¶ 22. A follow-up interview

with Mayhew was then conducted in the primary interview room, where it could be recorded. *Id.* ¶¶ 23-24. This second interview revealed further details, and lasted for a little longer than one hour. *Id.* ¶ 24. A question-and-answer style statement was signed by Mayhew, and approximately 12 minutes of this second interview were recorded on a VHS tape. *Id.* ¶¶ 24; Ex. I, TOE3572-76; Ex. C at 183-84; Ex. J, DAYS16118-16122; DAYS2240-41. Once the interview was completed, Calabrese reassured Mayhew her that she would "be okay." 56.1 ¶ 26; Ex. C at 247, 264. Calabrese then gave Mayhew and Getter food, after which, Mayhew and Getter drove themselves home. 56.1 ¶ 27, Ex. G, DAYS2242; Ex. H, DAYS11767-68. Calabrese followed up with Mayhew days later to check in, and Mayhew provided Calabrese with further updates about Days. Ex. K.

In short, no evidence shows that Calabrese pressured or manipulated Mayhew. *See also* Ex. G, DAYS2290 (explaining that the "[l]ast thing you want to do is push someone who is terrified"). It was Mayhew who placed the anonymous call, admitted she was the anonymous caller, and told Calabrese that Days confessed to killing two people in Eastchester. None of this was fabricated by Calabrese.

As to the third element of the fabricated-evidence claim, and key to causation and materiality here, Days cannot show that any of the alleged "fabricated" information by Calabrese, assuming it existed (it does not), was "likely to influence a jury's decision." *Garnett*, 838 F.3d at 279-80. This is because Calabrese's account of Mayhew's statements to him was hearsay, and "because a jury would have been able to hear directly from [Mayhew] h[er]self." *Bertuglia v. Schaffler*, 672 F. App'x 96, 101 (2d Cir. 2016) (summary order), *cert. denied*, 138 S. Ct. 78 (2017). Indeed, Mayhew *did* testify at the grand jury and at the first of five criminal trials, after which, when she was unavailable, her testimony was read to the jury. 56.1 Stmt. ¶ 75. Thus, the juries were able to hear Mayhew's version of all the relevant events first-hand. *Id.* None of Calabrese's actions show recklessness or amount to an "intentional wrong" with respect to Mayhew's interviews.

### 2.  No *Brady* Violation

There also is no evidence to support Plaintiff's *Brady* claim that Calabrese withheld exculpatory or potential impeachment material by attempting to misrepresent the nature of his interviews with Mayhew, or by concealing any of the factors that Plaintiff now claims made Mayhew an "unreliable" witness. Am. Compl. ¶¶ 68, 71. Nothing about the interviews with Mayhew was concealed. Mayhew's question-and-answer style written and signed statement, Calabrese's formal report about the interview, Doyle's notes, and the videotape all reflect—for anyone to see—the very attributes that Plaintiff now claims make Mayhew unreliable. These include, for instance, that Mayhew initially denied that she was the anonymous caller (out of fear), or that Mayhew said Days told her about the Eastchester killings well before Mayhew made the anonymous call to the MVPD. *See generally, e.g.*, Ex. I. Calabrese also provided all this information to prosecutors, and testified to all these factors openly in court during Days's criminal trials. 56.1 Stmt. ¶ 73. Plaintiff's defense attorney cross-examined Calabrese with questions related to Mayhew's reliability, as well. E.g., Ex. G, DAYS2288, 2292-2298. Calabrese explained, and did not attempt to hide, that Mayhew denied having initially made the anonymous call, that Mayhew had a prior relationship with Days and a new relationship with Getter, and described in detail the process of the interviews with Mayhew. *Id.*; 56.1 Stmt. ¶ 73.

Importantly, Mayhew's own testimony at Days's criminal trial included all the things that Plaintiff cites in an attempt to discredit Mayhew's initial February 2001 statement to Calabrese, such as Mayhew's prior relationship with Days and the length of time between Days's admission to Mayhew about the killings and her telling the police. E.g., Ex. P, DAYS5951-DAYS5967. Contrary to Plaintiff's claims (Am. Compl. ¶ 71 n.2), Mayhew never "backed away from her original accusation;" she simply refused to participate in further legal proceedings. 56.1 Stmt. ¶¶ 75-76. Certainly, Mayhew never recanted to Calabrese. Ex. C at 261-62. Plaintiff also made no effort to depose Mayhew in this action, choosing instead to speculate about the nature of her interviews in order to support his unfounded claims. *See, e.g.*, ECF No. 125 (Mayhew subpoena/order to show cause by Eastchester).

Finally, Plaintiff's fair trial claim sounding in *Brady* violations fails for the additional, independent reason that "[e]vidence is not 'suppressed' for *Brady* purposes if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015). While this rule does not impose a duty on a defendant "who was reasonably unaware of exculpatory information" to "take affirmative steps to seek [it] out," *id.*, it is plain that here, Days was not "reasonably unaware" of the information he claims made Mayhew unreliable. He knew of the alleged factors immediately, from his own knowledge and/or because they are apparent on the face of Mayhew's statements and testimony.

Ultimately, Plaintiff has adduced no evidence that Calabrese coerced or manipulated Mayhew to falsely implicate Days in the Eastchester murders, or that Calabrese withheld any evidence about Mayhew from prosecutors. Thus, Days has failed to raise a triable issue on this claim.

### B. Fair Trial Claim Regarding Days's Allegedly False Confession Fails

Any theory that Calabrese fabricated information or withheld exculpatory evidence regarding Days's confession to the Eastchester murders (e.g., Am. Compl. 76-81, 154) is unsupported.

#### 1. No Fabricated Evidence

Calabrese did not witness any fabrication of evidence as it relates to Days's confession and the alleged misconduct of the Eastchester Officers. As discussed fully in Point I, above, Calabrese did not observe any unconstitutional conduct of the EPD officers, and he certainly did not have reason to believe that Days's confession was "fabricated" in any way. *Cf. Ricciuti*, 124 F.3d at 126, 130. The fabrication of evidence claim against Calabrese regarding Days's confession must be dismissed.

#### 2. No *Brady* Violation

As to Plaintiff's *Brady* claim regarding Days's confession, there is no evidence—and indeed, there is only Plaintiff's speculation—that Calabrese somehow used his role as video recorder to suppress exculpatory information. The record shows that Calabrese was not even present for most of

—

Plaintiff's questioning. *See* Point I, *supra*. As for the brief period when Calabrese observed the Eastchester officers' questioning of Plaintiff, nothing suggests that Calabrese "conspired" not to record the entirety of Days's interview or confession. Rather, as Calabrese explained, once he and Doyle had completed Mayhew's interview, Calabrese agreed to sit in the monitoring room as Days's interview recommenced. 56.1 Stmt. ¶ 34. The officers determined that recording on a VHS tape would only begin if, and when, Days began speaking about the murders. *Id.* ¶¶ 35-36. Between 1:00 a.m. and 1:30 a.m., Calabrese observed Days, who was speaking about his background and relationships. *Id.* ¶ 38. At about 1:30 a.m., Days began speaking about the murders, and Calabrese attempted to record Days's testimony. *Id.* ¶¶ 39-41. The VCR was not loaded with a VHS tape, however, and the drawer where VHS tapes were supposed to be stored in the monitoring room happened to be empty. *Id.* ¶¶ 41-42. Thus, Calabrese began to take contemporaneous notes about what Days was saying, while at the same time attempting to locate a VHS tape to record the confession. *Id.* ¶¶ 42-43. Once a VHS tape was acquired, Calabrese started to record the interview. *Id.* ¶ 44. At this same time, Kiernan left the interview room and came in to the monitor room to ask Calabrese if he was recording. *Id.* ¶ 45. Calabrese explained to Kiernan that he had missed the initial portion of Days speaking about the murders, but that he was now recording. *Id.*

Viewing the record in the light most favorable to Plaintiff, there is simply no evidence supporting Plaintiff's allegation that Calabrese deliberately failed to record the interview, or conspired with EPD officers to record only after any supposed "coercion" was complete, to suppress evidence. Moreover, Calabrese did not forward the videotaped confession to the prosecutors himself: he was clear that he labeled and vouchered the video evidence, and turned it over to the Eastchester officers. *Id.* ¶ 67. And regardless, Calabrese shared the information about the videotaping mishap both with prosecutors and the juries, when he testified at five separate criminal trials. *Id.* ¶ 74. In his testimony, Calabrese candidly admitted that he "screwed up" because, when Plaintiff actually started discussing

the murders, Calabrese did not have a VHS tape ready. Ex. C at 208. However, there can be no claim that the failure to start videotaping earlier, or the delay from having to locate a videotape in an unfamiliar environment—which was not legally required—rose to the level of recklessness.

Finally, Plaintiff cannot state a *Brady* claim because—as with the purported "evidence" about Mayhew's unreliability—the alleged "coercion" was known to Days, and the only evidence presented are his own allegations. There is no dispute that Plaintiff would have had all the available "exculpatory" evidence about his own confession available to him. Whether those allegations are true as to the Eastchester police officers may raise a question of fact, but there is no question, as discussed in Point I, that Calabrese witnessed no such coercion, and there is similarly no material question of fact that Calabrese did not suppress evidence.

**C.  Calabrese is Entitled to Qualified Immunity on Plaintiff's Fair Trial and *Brady* Claims**

At the very least, Calabrese is entitled to qualified immunity on Plaintiff's fabricated evidence and *Brady* claims. Calabrese related all the information he gathered to the EPD officers conducting the investigation, and thereafter, to the prosecution and juries through his testimony. 56.1 Stmt. ¶¶ 73-74. As to the video recording, there is no clearly established right—and certainly was not in 2001— to have the entirety of an interrogation recorded. *See United States v. Osbourne*, No. 14-CR-6136 (FPG), 2016 U.S. Dist. LEXIS 188430, at *15 (W.D.N.Y. Oct. 5, 2016) ("Osbourne argues that the statements he made . . . must be suppressed because the interrogation was not recorded. Though [there were] policies requiring the audio- and videotaping of interrogations, their failure to comply with those policies does not, under current well-established caselaw, require the Court to grant defendant's motion to suppress.") (collecting federal cases), *report and recommendation adopted*, No. 14-CR-6136-FPG, 2017 U.S. Dist. LEXIS 104808 (W.D.N.Y. July 6, 2017). Moreover, even were there coercion initially (which the Eastchester officers deny), Calabrese witnessed none of it. As to the questioning he did witness, a reasonable officer in his position would have believed that observing, taking notes, and

videorecording Plaintiff's interview and confession did not violate any clearly established law, for the reasons already discussed above. As for Calabrese's failure to have a videotape at the ready, to the extent Days had a right to have his confession recorded, it cannot be said that Calabrese acted with malicious intent, or even recklessly—at most, his actions were a mistake, sounding in plain negligence, which does not rise to a constitutional violation (and which would not survive this motion under the Stipulation). Thus, Plaintiff was at least entitled to qualified immunity on Plaintiff's right to trial claims.

### III.    Plaintiff's Federal & State Malicious Prosecution Claims (Counts III, VII) Fail
### A. Law Regarding Malicious Prosecution

Days has failed to adduce any evidence supporting his federal and state-law malicious prosecution claims against Calabrese. To sustain a Section 1983 claim based on malicious prosecution, a plaintiff must establish a seizure amounting to a Fourth Amendment violation, and must also establish the elements of a malicious prosecution claim under state law. *Manganiello v. City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010). New York law places "a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). A plaintiff must establish four elements: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal quotation marks omitted).

"A defendant initiates a proceeding when he plays an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Buari*, 530 F. Supp. 3d at 383 (internal quotation marks omitted). A claim for malicious prosecution against a police officer requires a showing that he did "more than report the crime or give testimony." *Manganiello*, 612 F.3d at 163. For instance, "[a] jury may permissibly find that a defendant initiated a prosecution where he 'fil[ed] the charges' or 'prepar[ed an] alleged false confession and forward[ed] it to prosecutors." *Id.*

21

Probable cause is an absolute defense to a malicious prosecution claim. *Savino v. City of N.Y.*,

331 F.3d 63, 72 (2d Cir. 2003) (citing *Colon v. City of N.Y.*, 60 N.Y.2d 78, 82, *rearg denied*, 61 N.Y.2d 670

(1983)). "Probable cause, in the context of malicious prosecution, has . . . been described as such facts

and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*

*v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (internal quotation marks omitted). Where a plaintiff was

indicted by a grand jury, there is also a presumption that there was probable cause for his prosecution.

*Id.* In order to overcome the presumption, a plaintiff must show that the grand jury indictment was

obtained by "fraud, perjury, the suppression of evidence, or police conduct undertaken in bad faith."

*Newton v. City of N.Y.*, 640 F. Supp. 2d 426, 447 (S.D.N.Y. 2009) (internal quotation marks omitted).

## B. Calabrese Did Not Maliciously Prosecute Days

Plaintiff's malicious prosecution claim against Calabrese cannot stand as a matter of law for

three independent reasons: (1) Calabrese did not initiate the proceeding against Days; (2) there was

probable cause to prosecute Days; and (3) Calabrese lacked any actual malice as to Days's prosecution.

### 1. Calabrese Did Not Initiate the Proceeding

First, there is no evidence that Calabrese initiated a criminal proceeding against Plaintiff.  The

complaint in support of the criminal action was signed by Kiernan (Ex. S)—not Calabrese, whose

actions were limited to observing a portion of Days's interview, recording his confession, and taking

Mayhew's statement. It is also clear from the record that Calabrese gave the recorded videotape

confession to the Eastchester officers because it was their case. 56.1 Stmt. ¶ 67. And as further

discussed above in Point II, Plaintiff has adduced no evidence that Calabrese made inaccurate or

incomplete statements to the DA, misrepresented or falsified evidence, or otherwise acted in bad faith,

which could provide support for his "initiation" of the proceeding against Plaintiff. *See Manganiello*,

612 F.3d at 163 (officer actively elicited "circumstantially suspect" witness statements, forwarded them

to prosecutor, was in touch with prosecutor once a week, and signed felony complaint). Thus, the

DA's exercise of independent judgment to prosecute also breaks any causal chain, such that the continued prosecution of Plaintiff is attributable to the DA, not to Calabrese. *Thomsen*, 2016 U.S. Dist. LEXIS 17079, *23.

### 2. There Was Probable Cause to Prosecute Days

Second, Plaintiff's malicious prosecution claim fails as to Calabrese because there was probable cause to prosecute Days for the Eastchester murders, and a reasonably prudent officer in Calabrese's position would have believed that Plaintiff was guilty of the murders. Mayhew's statements provided evidence of Days's potential guilt. Calabrese then witnessed, immediately after obtaining the statement from Mayhew, Days's own confession to the crime, during which he provided numerous details about the murders, often in response to open-ended questions. Ex. O; Ex. Q. Also during Plaintiff's confession, the EPD officers elicited details of the motive for the killings: Harris's sexual assault upon Days's own mother, Stella Days, the former home health aide. Observing this, a reasonable officer in Calabrese's position, with all the available evidence, would have believed probable cause existed to prosecute. *See Thomsen*, 2016 U.S. Dist. LEXIS 17079, at *21-22 (finding probable cause to prosecute where suspect "wrote out a clear, if hesitant, confession to sexual wrongdoing"). Moreover, where, as here, a grand jury indicted Plaintiff, a presumption of probable cause exists that can only be overcome with evidence that the indictment was obtained by "fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith." *Newton*, 640 F. Supp. 2d at 447. Plaintiff alleges vaguely that this is the case, but as demonstrated in Point II, there is no evidence that Calabrese suppressed evidence, perjured himself, or undertook any of the actions related to Days's investigation in bad faith.

### 3. Calabrese Did Not Have Actual Malice

Third, Plaintiff's malicious prosecution claim fails for the additional reason that there is no evidence of actual malice. Plaintiff is required to present evidence that Calabrese "must have commenced the criminal proceeding due to a wrong or improper motive, something other than a

desire to see the ends of justice served." *Lowth v. Tn. of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (internal quotation marks omitted). No such showing of has been made here.

### 4. Calabrese Should Be Protected by Qualified Immunity on This Claim

Even if the Court were to find that there is a question of fact as to whether objective probable cause were lacking based on Plaintiff's coercion claims, Plaintiff's malicious prosecution claim still fails against Calabrese. This is because Calabrese, at a minimum, had *arguable* probable cause to believe that Plaintiff had committed the murders, entitling him to qualified immunity. *See Thomsen*, 2016 U.S. Dist. LEXIS 17079, *21-22 ("At the very least [the officer] is protected by qualified immunity because officers of reasonable competence could disagree about whether there was probable cause to arrest Thomsen."); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.").[10]

### 5. The County Is Not Liable

Because Days cannot maintain his state-law malicious prosecution claim against Calabrese, his malicious prosecution claim against the County must also be dismissed. *Maldonado v. City of N.Y.*, 11-CV-3514 (RA), 2014 U.S. Dist. LEXIS 26239, *41 (S.D.N.Y. Feb. 26, 2014) (dismissing claim against city when state law malicious prosecution claims were dismissed against individual defendants).

### IV. The *Manuel* Claim Against Calabrese (Count IV) Is Deficient as a Matter of Law

While a claim may be brought under *Manuel v. Joliet* to contest the legality of pretrial confinement, the existence of probable cause (or, under the doctrine of qualified immunity, arguable probable cause) is a complete defense to this claim. 580 U.S. 357, 360 (2017). As discussed above in

---

[10]New York has a similar immunity doctrine, such that it would also be appropriate to dismiss the state law claim for malicious prosecution, at least, based on immunity. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 88 (2d Cir. 2007).

Point III, because there was probable cause—or at the very least, arguable probable cause—to prosecute Days for the Eastchester murders, Plaintiff's claims under *Manuel* must be dismissed. Moreover, Calabrese was not the arresting officer (for either the order of protection violation or the homicides), and so any *Manuel* violation cannot be attributed to him. In short, there is no evidence that Calabrese acted recklessly or intentionally to secure Days's detention without probable cause.

## V.    Plaintiff's Claims Under the New York State Constitution (Count IX) Fail

For all the above reasons, Plaintiff has failed to demonstrate that Calabrese or the County has violated his rights under the New York Constitution. Moreover, because Plaintiff has failed to articulate any violation of the State Constitution that is distinct from his federal constitutional claims (brought under Section 1983), his state due process and unreasonable search/seizure claims must be dismissed. *Maldonado*, 2014 U.S. Dist. LEXIS 26239, at *37-38 (state constitutional claims dismissed where they reiterated Section 1983 claims and/or had state common law remedies).

## CONCLUSION

For the foregoing reasons, defendants County of Westchester and Christopher Calabrese respectfully request that their motion for summary judgment on all plaintiff's claims be GRANTED, and that this Court issue a judgment in their favor, dismissing the Amended Complaint in its entirety, along with any further relief that this Court deems just and proper.

Dated:  White Plains, New York         JOHN M. NONNA
      June 26, 2024                WESTCHESTER COUNTY ATTORNEY
                           148 Martine Avenue, Suite 600
                           White Plains, New York 10601

                              /s/ *Shawna C. MacLeod*
                           Shawna MacLeod
                           Sr. Assistant County Attorney
                           scma@westchestercountyny.gov
                           914-995-4194